

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-76,781-01

### EX PARTE ROBERTO GONZALEZ DE LA CRUZ, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 835305-A IN THE 174TH JUDICIAL DISTRICT COURT
### FROM HARRIS COUNTY

**ALCALA, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

In this application for a post-conviction writ of habeas corpus, we consider a claim that the use of false testimony in a criminal trial violated a defendant's due-process rights. We additionally consider whether such a claim may be subject to procedural default for failure to raise it at some earlier stage of the proceedings. We address these matters in the context of considering the false-evidence claim raised by Roberto Gonzalez De La Cruz, applicant, based on his assertion that his 2000 conviction for murder was procured in violation of his due-process rights as a result of the introduction of false testimony from

eyewitness Marcos Torres at his trial. Concluding that applicant's present claim is not procedurally barred because he had no prior opportunity to fully litigate it, we reach the merits of his claim. We determine that the record fails to demonstrate that applicant's conviction was procured on the basis of false testimony, and, alternatively, even assuming that false testimony was admitted at applicant's trial, that testimony was not material to his conviction. We, accordingly, deny relief.[1]

## I. Background and Trial Proceedings

The facts of this case pertain to the November 1998 murder of Jorge Pena. A police officer discovered Pena's body while on early morning patrol in a secluded area of the Baytown Nature Center. Pena was found lying face down in a pool of blood with an apparent gunshot wound to the head. Initially, investigators had few leads in the case. It was not until approximately one year later that detectives received a tip from a confidential informant suggesting that applicant had been involved in Pena's murder. Based on the informant's tip, officers arrested applicant's son-in-law, Juan De La Garza, and De La Garza's friend Marcos Torres, both of whom were said to have been present at the time of the shooting of Pena. Based on incriminating statements given by De La Garza and Torres, applicant was indicted for Pena's murder.

---

[1] In addition to his false-evidence claim, applicant raised claims pertaining to ineffective assistance of trial counsel and actual innocence. This Court did not file and set those claims, and the habeas court did not address those claims in its findings of fact and conclusions of law. We have independently reviewed applicant's other claims, and, concluding that they lack merit, we accordingly deny them.

As described below, the evidence adduced at applicant's trial can be grouped into two categories: (A) evidence suggesting that applicant shot Pena, transported his body to the nature center and dumped it there, which was the State's theory, and (B) evidence suggesting that Pena was shot at the nature center, which was applicant's defensive theory.

**A. Evidence Indicating that Pena Was Shot and Then Transported To Nature Center - Testimony of Marcos Torres and Baytown Police Officers**

The State's theory at applicant's murder trial was that applicant shot Pena in a Baytown alley before transporting his body to the nature center and dumping it there. The State's theory centered on the eyewitness testimony of Torres, who testified that he witnessed applicant commit the shooting and dump Pena's body. Specifically, Torres testified that, on the night of Pena's murder, he met applicant and De La Garza at De La Garza's home in Baytown. The men were drinking and doing cocaine. At around eight or nine at night, the three men got into applicant's car and began "riding around." At some point between midnight and one in the morning, applicant saw a group of three or four men he knew standing in an alley near a location in Baytown called Porras Bakery. Applicant parked the car, got out, and went to talk to the group, while Torres and De La Garza stayed in the car. Torres identified one of the men as Pena. After talking with the men for ten to fifteen minutes, applicant returned to the car, said he was "going to do something stupid," and "got something out" from under the driver's seat. Torres and De La Garza got out of the vehicle. Applicant then walked towards Pena and shot him in the face while standing approximately five to six feet away from him.

According to Torres, after the shooting, De La Garza fainted, and the other men who had been standing with Pena ran away. Applicant then ordered Torres and De La Garza to pick up Pena and put him in the car. Torres stated that De La Garza was too shaken to help move Pena, so Torres picked up Pena by himself and "threw [Pena] in the back seat." Applicant then told Torres to drive, and Torres drove to a place near "some water." The group "stopped and [applicant] got off and took [Pena] out and threw him" out of the car. Torres took Pena's blue coveralls, which applicant had taken from the scene of the shooting, and "threw them out" on top of Pena's body. Torres then drove the three men back to town, at which point Torres went home.

On cross-examination, defense counsel sought to impeach Torres by pointing out inconsistencies in his testimony. Torres, who was unable to recall many details from the night of the shooting, explained that this had all "happened three years ago," when he was "drunk" and "on other drugs." When asked how he had been able to pick up Pena by himself and put him in the car, Torres initially stated that he did not remember how he did it, and he eventually said that he picked Pena straight up and dragged him to the car. Torres did not report the incident to the police because he was "afraid he was going to get sentenced for something [he] really didn't do," and because he was afraid of applicant. Torres acknowledged that he had, on one prior occasion, been a paid informant for the police, but stated that he did not receive any payment in exchange for information in this case.

In addition to the testimony of Torres, the State presented the testimony of four

Baytown police officers, all of whom opined, based on their review of the crime-scene evidence, that Pena likely had been shot elsewhere and his body dumped at the nature preserve. Officer Naismith reported that he found Pena lying face down in a "puddle of blood approximately the size of a basketball," with blue coveralls placed on top of him. Naismith additionally noted the presence of tire tracks, which indicated to him that "a vehicle had pulled up and backed in directly in front of the body where it was laying." Officers Woolcock and Erikson noted the absence of blood spatter, bone, or brain matter around the body, and they additionally noted the absence of shells, casings or bullet fragments, all of which, they suggested, was consistent with Pena's body having been dumped at the scene. Woolcock additionally took note of a "line of blood going down the right side" of Pena's shirt and pants, which, in his opinion, was "consistent" with Pena having been propped up at some point after he was shot. Detective Budd similarly observed the presence of "blood stains, drips from [Pena's] facial area, down the right portion of his torso, chest and abdomen area," which to him suggested "that [Pena] had possibly been sitting or propped up" while being "moved from a different location." The officers thus were largely consistent as to their mutual opinion that, based on their knowledge of crime-scene analysis, Pena had been shot elsewhere and moved to the nature center. The officers, however, acknowledged that they were not medical or forensic experts.

**B. Evidence Suggesting that Pena Was Shot At Nature Center - Testimony of Assistant Medical Examiner Dr. Paul Shrode**

In contrast to the State's theory that was based on Torres's eyewitness account,

applicant's defensive theory was based on the forensic testimony of Harris County Assistant Medical Examiner Dr. Paul Shrode, who conducted the autopsy on Pena and who opined, based on his review of the scene photographs, that Pena had been shot where he was found and not at some other location. Noting that Pena was found lying face down with his shirt still tucked in and one hand still in his shorts pocket, Dr. Shrode observed that such positioning of the body would be "unusual" if Pena, who was five-foot-ten and weighed 256 pounds, had been dragged, transported by vehicle, and then dumped at the nature center. Dr. Shrode additionally observed the absence of dirt or grass stains on Pena's clothing, which, in his opinion, was an additional circumstance suggesting that Pena had not been moved after he was shot.

Aside from these observations, Dr. Shrode noted that there was a large pool of blood under Pena's head. Dr. Shrode opined that such a large volume of blood likely would not have been present had Pena been shot elsewhere because blood exudes from a gunshot wound only during the time that the heart is pumping, and the wound that Pena sustained likely would have caused his heart to stop beating within several minutes, thus cutting off the flow of blood almost immediately. In particular, Dr. Shrode explained that, although Pena may have been brain dead, his heart was "probably still beating for a little bit. I can't tell you how long. Maybe a minute or two." On the basis of the blood evidence at the scene, Dr. Shrode concluded that the evidence was "more consistent" with Pena having been shot and then "having been alive for some time at the scene," with blood exuding from the wound for

several minutes immediately after he was shot. Asked by defense counsel whether a version of events in which Pena was shot at another location and then moved to the nature center would be consistent with the forensic evidence, Dr. Shrode opined that it "sounds more believable that [Pena] was shot where they found him." Asked whether Pena's heart could have continued beating for up to ten to fifteen minutes, which was the maximum amount of time it would have taken to drive from Porras Bakery to the nature center, Dr. Shrode stated that he did not think that was likely, given the nature of Pena's injuries.[2]

In addition to his opinion surrounding the location at which Pena was shot, Dr. Shrode testified that the cause of death was a single perforating gunshot wound to the face, with a second laceration to the back of Pena's head being described as an exit wound. The entry wound, Dr. Shrode opined, had "unique characteristics of a contact gunshot wound to the face or skin," including "some seared margins . . . suggesting that the muzzle of the gun was at least . . . one to two inches" from the wound. The "large laceration," "burning of the skin," and hemorrhage of blood were all consistent with a contact gunshot wound, and the wound in the back of Pena's head was "characteristic of an exit wound" because of its "unique beveling," and because such a "large laceration or tear of the scalp" was "consistent with the bullet fragmenting as it exited the skull." Dr. Shrode also said it was possible that the person who shot Pena was standing around five feet away from him, depending on the

---

[2]     The Baytown police officers gave varying testimony regarding the amount of time it would have taken applicant to drive from Porras Bakery to the nature center, with estimates ranging from five to fifteen minutes, depending on traffic and the time of day.

length of the shooter's arm. Consistent with this testimony, Dr. Shrode's original autopsy report indicated that the cause of Pena's death was an "entrance type gunshot wound," which was further described as a "hard contact type entrance wound" that entered Pena's head between the right eye and the bridge of the nose, traveling "front to back, right to left, and slightly upward." The report indicated that two "deformed lead fragments and one fragment of a copper jacket" were recovered, "all consistent with a single projectile." Thus, aside from his suggestion that the likely location of Pena's shooting was the nature center, and not some other location, Dr. Shrode's description of Pena's physical injuries and the original autopsy report were largely consistent with Torres's description of the shooting.

After the State rested, the defense did not call any witnesses. During closing arguments, defense counsel urged the jury to reject Torres's testimony as "totally incredible." Defense counsel described Torres as "a paid informant, a crack head," whose story was riddled with inconsistencies. Counsel asked the jury to "compare Marcos Torres with Dr. Shrode" and find that "Marcos Torres is completely not credible. Cannot believe what he says. [His testimony] is ridiculous." Counsel argued that the jury should instead rely upon the testimony of Dr. Shrode, who was "the only one credible, reliable witness who has raised doubt as to the entire testimony of Marcos Torres," and who had indicated that there was "no way [Pena] was shot some fifteen minutes away and driven in a car and dumped at the site over here." Rejecting these arguments, the jury found applicant guilty of murder, and the trial court sentenced him to ninety-nine years' imprisonment. Applicant's conviction was affirmed

on direct appeal.[3]

### C. Habeas Evidence - Amended Autopsy Report and Testimony of Dr. Wolf

As evidentiary support for his post-conviction false-evidence claim challenging Torres's eyewitness testimony, applicant presented to the habeas court an amended autopsy report from the Harris County Medical Examiner's Office, which, he asserts, conclusively establishes that Torres's testimony was false in its entirety. In particular, the amended autopsy report, issued in 2011 by current Deputy Chief Medical Examiner Dr. Wolf, states that the cause of Pena's death was two gunshot wounds to the head, as opposed to Dr. Shrode's opinion that Pena had been shot once, with an entrance and exit wound from a single bullet. The amended report states, "It is apparent that the decedent actually had two gunshot wounds, rather than a single wound. One of these shots entered the face, and one entered the back of the head (the latter was erroneously interpreted as an exit wound in the original report)." The cause of death was accordingly "amended to gunshot wounds (2) of the head." The manner of death remained a homicide.

In addition to revising the number of gunshot wounds sustained by Pena, the amended autopsy report indicates that the wound to Pena's face was an "intermediate range gunshot wound, associated with sparse stippling,"[4] whereas the wound to the back of the head was

---

[3] *De La Cruz v. State*, No. 01-01-00031-CR, 2002 WL 1340308, at *1 (Tex. App.—Houston [1st Dist.] June 20, 2002) (not designated for publication).

[4] According to Dr. Wolf's habeas testimony, an intermediate-range shot "means that the barrel of the gun would have been somewhere between two inches and two feet of the skin."

a "tangential shot, associated with a singular ovoid skull defect with eccentric beveling." This description of Pena's wounds differed from Dr. Shrode's opinion that the gunshot wound to Pena's face was either a "contact wound" or was caused by a gun held one to two inches away from Pena's face. With respect to the recovered bullet fragments, the report stated that it was "unclear whether the bullet fragments recovered [were] associated with the gunshot wound of the face, the back of the head, or both."

In light of applicant's claim based on the amended autopsy report, the habeas court held a live hearing at which Dr. Wolf testified. Aside from the discrepancies between the two experts' opinions as described in the amended autopsy report, Dr. Wolf largely agreed with Dr. Shrode's trial testimony, including Dr. Shrode's opinion that Pena likely was shot where he was found. Like Dr. Shrode, Dr. Wolf noted the presence of a "pool of blood where the head was and then a trail of blood leading back, which corresponds to a bloodstain on the front of the decedent's clothing[.]" Given the severity of the shot to Pena's face, which likely would have caused his heart to stop beating within a short period of time, Dr. Wolf opined that, had Pena been shot elsewhere and transported to the nature center, there would "probably be less" blood in the pool on the ground, and there would likely be more blood on the back of Pena's head and clothing. Dr. Wolf theorized that the blood evidence was "consistent with [Pena] having been shot right there[,] leaning forward as the blood drips down and trails across the ground." He explained that the large bloodstain on Pena's shirt was "probably [caused by blood] dripping down from the face," while a thinner trail of blood

"may either [have been caused by] dripping down [from the face] or transfer from the ground to the shirt." Dr. Wolf's ultimate opinion, like that of Dr. Shrode, was that "everything we're seeing here is consistent with" Pena having been at the location where his body was found, down on his knees, with his torso erect, at the time of the first shot to the face, after which he fell forward onto the ground. The second shot to the back of the head was "most likely when he was already on the ground." Asked whether it was plausible that Pena had been shot at another location and his body transported by vehicle ten minutes across town before being dumped, Dr. Wolf stated, "I think taking everything together here, that is an inconsistent story with what we're seeing." According to Dr. Wolf, there was nothing that led him to think that Pena was shot "anywhere other than right where he was at," and any forensic testimony suggesting otherwise "would be erroneous."[5]

Based upon the revised autopsy report and the testimony of Dr. Wolf, the State entered

---

[5]     Dr. Wolf's opinion regarding the location of Pena's shooting was echoed in an affidavit from Tom Bevel, a forensic investigator and associate professor of forensic sciences. Based on his examination of the scene photographs, Bevel similarly opined that

> the victim Pena was not shot, transported by vehicle and then dumped at the location where found. If this had [ ] occurred[,] he would not still have his right hand in his shorts pocket, his body position, as found, would be different, there would be sand, dirt and grass drag marks on his clothing, there would be little to no blood pooling at this location[,] and blood lost during transport would be found on his body and clothing consistent with such transport and blood loss . . . . The physical evidence *is* consistent with [Pena] being torso erect with his knees on the ground while his right hand is in his right shorts pocket at the time he was shot. After he is shot[,] a trail of blood was lost down the front of his clothing from a bleeding wound, he leaned forward causing the trail of blood on the ground in front of where his knees were positioned and then fell forward face down onto the ground. There was enough blood pressure to cause the blood pool to form under and around his head.

into a stipulation that

> the credible forensic evidence is more consistent with the theory that [Pena] was shot at the location where he was found; and was not shot at another location, transported by vehicle, and dumped at the location where he was found. The credible forensic evidence demonstrates that the complainant had two gunshot wounds rather than a single gunshot wound. One of the shots entered the face and one entered the back of the head. The wounds described by Dr. Shrode at the trial and his testimony [indicating the existence of an] exit wound is in fact a second entrance wound. The cause of death is gun shot wounds to the head.

## D. Habeas Court's Findings of Fact and Conclusions of Law

The habeas court adopted applicant's proposed findings of fact and conclusions of law, and it recommended that relief be granted on the basis that Torres had testified falsely and that his testimony was material to the jury's finding of guilt, thereby resulting in a violation of applicant's due-process rights.[6] In particular, the habeas court found that both the revised autopsy report and the testimony of Dr. Wolf were credible. The trial court found that "anyone who said that he saw Jorge Pena shot at a different location from where his body was found was inaccurate and not supported by the amended autopsy report." The habeas court's findings and conclusions also stated,

- "[A]ll of the evidence presented by the State that inculpates Applicant was the testimony of Marcos Torres and the State's attempt to corroborate his testimony by the forensic testimony of [the police officers]," none of whom had any specialized training in blood spatter analysis or forensic interpretation of evidence;

---

[6] The habeas court's findings of fact and conclusions of law span twenty-three pages and include thirty-four findings of fact and several paragraphs explaining the court's legal conclusions. We have provided excerpts of the habeas court's findings and conclusions that are most relevant to our resolution of applicant's claim.

- "[T]he amended autopsy report which stated that Jorge Pena was shot twice would have in all probability resulted in a different jury verdict because of the credible and unchallenged testimony of Dr. Dwayne Wolf that the second shot to the head of Jorge Pena occurred in close proximity in time to the first shot to Jorge Pena's head and the second shot definitely occurred at the location where Jorge Pena's body was found";

- "[T]he second gunshot wound proves that [Pena] was shot where his body was discovered and [that the shooting] could not have occurred as described by Marcos Torres"; and,

- "The State's theory at trial has no evidentiary basis or credible forensic support . . . . The Court finds that the credible forensic evidence proves that the testimony of Marcos Torres is false."[7]

The court additionally found that the testimony of Torres and officers Erikson, Woolcock, and Budd was "not credible" and was "false" based on the fact that "the credible forensic evidence demonstrates that the complainant had two gunshot wounds rather than a single gunshot wound and that [Pena] was actually shot where his body was discovered." Specifically, in regards to the testimony of Torres, the court found that his testimony was "entirely untrue based on the uncontradicted forensic evidence" and that it was "clear from all of the competent and credible forensic evidence that Torres's testimony is false with no credible evidentiary basis." The habeas court concluded,

> The State's entire case against Applicant [was] based on the false testimony of Marcos Torres. . . . The clear and uncontradicted testimony establishes that there were two gunshot wounds to the head of Jorge Pena that occurred in close proximity to each other. The clear and uncontradicted evidence is that

---

[7]    The habeas court additionally made findings that "the State intentionally misrepresented the forensic facts in its final arguments" and that the "State's theory of the case is premised on the false testimony of Marcos Torres that was created with the assistance of Baytown Police Officer Raul Budd." Because the State's intent is immaterial to the question of falsity, and because we do not reevaluate the relevant materiality standard in this case, we need not address these findings here.

the second shot occurred while Pena's heart was pumping and had to have occurred where the body was recovered.

> The new findings by Dr. Wolf constitute newly discovered evidence because [they] clearly establish[ ] that Jorge Pena was shot and killed at the Brownwood Nature Preserve. . . . Applicant could not have committed the murder according to the credible and uncontradicted forensic evidence presented by Applicant, as stipulated to by the State. The existence of the second bullet wound to the deceased['s] head establishes that [Torres's] testimony is false and that Applicant has been denied due process.

On this basis, the habeas court recommended that applicant be granted a new trial.

## II. Applicant's Habeas Claim is Not Procedurally Defaulted

After the habeas court forwarded the application and its recommendation to this Court, we requested briefing on the issue of whether applicant could have raised his false-evidence claim in an earlier proceeding and whether his claim should be subject to procedural default. With respect to that matter, we conclude that applicant's claim is not procedurally barred because the thrust of his complaint is premised on new factual and legal bases that were not reasonably available to him during his trial or direct appeal.

As a general matter, this Court has long held that a convicted person may not raise a claim for the first time in a habeas-corpus proceeding if he had a reasonable opportunity to raise the issue at trial or on direct appeal and failed to do so. *Ex parte Jimenez*, 364 S.W.3d 866, 880 (Tex. Crim. App. 2012) (observing that, "[o]rdinarily a convicted person may not raise an issue in a habeas proceeding if the applicant could have raised that issue on direct appeal"); *see also Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004) ("We have said countless times that habeas corpus cannot be used as a substitute for appeal, and that it

may not be used to bring claims that could have been brought on appeal.").  Even claims of a constitutional dimension are "forfeited [on habeas] if the applicant had the opportunity to raise the issue on appeal. This is because the writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law."  *Ex parte Townsend*, 137 S.W.3d 79, 81-82 (Tex. Crim. App. 2004); *see also Ex parte Moss*, 446 S.W.3d 786, 788-90 (Tex. Crim. App. 2014) (explaining that constitutional rights can be forfeited on habeas due to lack of action); *Garza v. State*, 435 S.W.3d 258, 262 (Tex. Crim. App. 2014) (explaining that "this Court will not review the merits of a habeas corpus claim if an applicant had the opportunity to raise the issue on appeal").

Having taken note of this general principle, we conclude, in the present case, that applicant's claim is not procedurally barred because he did not have an adequate opportunity during his 2000 trial or his 2001 direct appeal to raise his claim, which rests upon the 2011 amended autopsy report and the testimony of Dr. Wolf.  *See In re Daniel*, 396 S.W.3d 545, 548 n. 11 (Tex. Crim. App. 2013) ("Assuming, without deciding, that [Daniel's] claim would be subject to ordinary notions of procedural default, we note that he has raised his claim at the earliest opportunity," and considering claim on merits); *Burt v. State*, 396 S.W.3d 574, 577 (Tex. Crim. App. 2013) ("The requirement that an objection be raised in the trial court assumes that the appellant had the opportunity to raise it there.").  In light of the unavailability of Dr. Wolf's amended autopsy report—which applicant contends demonstrates the falsity of Torres's testimony—at the time of applicant's prior proceedings,

applicant could not reasonably be expected to have formulated his present claim during an earlier proceeding, and he has, therefore, raised his claim based on the amended report at the earliest possible opportunity. *See Jimenez*, 364 S.W.3d at 880; *Estrada v. State*, 313 S.W.3d 274, 288 (Tex. Crim. App. 2010) (holding that false-evidence claim was not procedurally defaulted; defendant "had no duty to object because he could not reasonably be expected to have known that the testimony was false at the time that it was made").

In addition to taking note of the prior unavailability of applicant's claim that is premised on the newly available amended autopsy report, we observe that the legal basis underlying applicant's claim, this Court's recognition of a due-process violation stemming from the State's unknowing use of false testimony, was not firmly established by this Court until its 2009 opinion in *Ex parte Chabot*, 300 S.W.3d 768, 771 (Tex. Crim. App. 2009); *see also Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012) (in context of determining whether Chavez had overcome bar on successive writs, explaining that *Chabot* constituted "new, previously unavailable legal basis" by recognizing due-process claim based on State's unknowing use of false evidence). Because this Court had not yet expressly recognized the type of claim at issue in this case as of the time of applicant's prior proceedings, and because his claim is based on new facts that have emerged since the time of his trial in the form of the amended autopsy report, we conclude that these circumstances, in conjunction, weigh in favor of consideration of his claim on the merits.

### III.  Applicant Has Not Met Burden of Proving False-Evidence Claim

Having determined that applicant's claim is not procedurally defaulted, we (A) describe the applicable law. We then determine that (B) applicant has failed to adequately demonstrate the falsity of Torres's testimony, and (C) alternatively, even assuming that applicant has met his burden of showing that certain aspects of Torres's testimony were false, that evidence was not material to his conviction.

## A. Applicable Law

On post-conviction review of an application for a writ of habeas corpus, the convicting court is the "original factfinder," and this Court is the "ultimate factfinder." *Chavez*, 371 S.W.3d at 207. This Court ordinarily defers to the habeas court's fact findings, particularly those related to credibility and demeanor, when those findings are supported by the record. *Ex parte Navarijo*, 433 S.W.3d 558, 567 (Tex. Crim. App. 2014) (citing *Ex parte Weinstein*, 421 S.W.3d 656, 664 (Tex. Crim. App. 2014)). We similarly defer to a habeas judge's ruling on mixed questions of law and fact if the resolution of those questions turns on an evaluation of credibility and demeanor. *Weinstein*, 421 S.W.3d at 664. However, "[w]hen our independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record, we may exercise our authority to make contrary or alternative findings and conclusions." *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008). We review de novo both pure questions of law and mixed questions of law and fact that do not depend upon credibility and demeanor. *Weinstein*, 421 S.W.3d at 664. In the specific context of a false-evidence analysis, "[w]e review factual findings concerning

whether a witness's testimony is perjurious or false under a deferential standard, but we review the ultimate legal conclusion of whether such testimony was 'material' de novo." *Id.*

With respect to the substantive analysis of a due-process false-evidence claim, this Court has recognized that the use of material false evidence to procure a conviction violates a defendant's due-process rights under the Fifth and Fourteenth amendments to the United States Constitution. *See Weinstein,* 421 S.W.3d at 665; *Chavez*, 371 S.W.3d at 207-210; *see also* U.S. CONST. amend. V, XIV; *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). A conviction based on such materially false evidence results in a due-process violation, regardless of whether the falsity of the evidence is known to the State at the time of trial. *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011); *Ex parte Robbins*, 360 S.W.3d 446, 460 (Tex. Crim. App. 2011). In order to be entitled to post-conviction habeas relief on the basis of false evidence, an applicant must show that (1) false evidence was presented at his trial and (2) the false evidence was material to the jury's verdict of guilt. *See Weinstein*, 421 S.W.3d at 659, 665. An applicant must prove the two prongs of his false-evidence claim by a preponderance of the evidence. *See id.*

In determining whether a particular piece of evidence has been demonstrated to be false, this Court has explained that the relevant question is whether the testimony, taken as a whole, gives the jury a false impression. *Ghahremani*, 332 S.W.3d at 479 (agreeing with convicting court's determination that evidence was false because it "creat[ed] a misleading

impression of the facts"); *see also Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (evidence is false if it leaves jury with a "false impression"). "[I]mproper suggestions, insinuations and, especially, assertions of personal knowledge constitute false testimony." *Robbins*, 360 S.W.3d at 460 (citations and internal quotation marks omitted). This Court has consistently held that testimony "need not be perjured to constitute a due process violation; rather it is sufficient that the testimony was false." *Chavez*, 371 S.W.3d at 208 (citing *Robbins*, 360 S.W.3d at 460). That is because a false-evidence due-process claim is "not aimed at preventing the crime of perjury—which is punishable in its own right—but [is] designed to ensure that the defendant is convicted and sentenced on truthful testimony." *Weinstein*, 421 S.W.3d at 666 (quoting *Chavez*, 371 S.W.3d at 211) (Womack, J., concurring)).

In prior cases, this Court has acknowledged that various types of evidence introduced on habeas may serve to demonstrate the falsity of evidence introduced at trial. For example, in *Weinstein*, this Court determined, based on the presentation of official reports from governmental mental-health agencies, that Weinstein had made an adequate showing of falsity as to a witness's testimony that he had never experienced auditory or visual hallucinations when the reports indicated that the witness had a mental illness that caused him to hear voices and hallucinate. *Weinstein*, 421 S.W.3d at 666. In *Chavez*, this Court concluded that Chavez had made an adequate showing of falsity as to eyewitness testimony indicating that Chavez was the shooter in an armed robbery when, subsequent to his trial, someone else confessed to being the actual shooter, entered a plea of guilty, and was

convicted of the offense. *Chavez*, 371 S.W.3d at 208 (explaining that, in light of confession by actual shooter, which was "ultimately confirmed by the subsequent guilty plea and conviction of that individual," it was "undisputed" that eyewitness testimony was false). Furthermore, in *Chabot*, this Court relied upon DNA results "conclusively link[ing]" an accomplice witness to the sexual assault of the complainant to reach the conclusion that the witness perjured himself at Chabot's trial by suggesting that it was Chabot who had committed the sexual assault. *Chabot*, 300 S.W.3d at 772. On the other hand, in *Ex parte Robbins*, this Court rejected Robbins's suggestion that the medical examiner's testimony as to the complainant's cause of death, asphyxiation caused by homicidal violence, had been proven false based on a "re-evaluation of the evidence," which resulted in the medical examiner revising her opinion to result in a "different, undetermined opinion" as to the cause of death. 360 S.W.3d at 461-62. In that case, the Court explained that the medical examiner's trial testimony "did not result in a false impression of the facts" because she "testified openly about the autopsy findings and her professional opinion," and neither her conclusion nor the evidence upon which she relied "has been entirely refuted by any expert." *Id.* at 462. When examined cumulatively, these decisions suggest that definitive or highly persuasive evidence introduced in a post-conviction habeas proceeding may show by a preponderance of the evidence that testimony used to obtain a conviction was false. But these decisions do not address the question before us in the present proceeding with respect to whether new evidence introduced on habeas adequately establishes falsity when the

essence of that evidence was heard and rejected by the jury at trial.

## B. Applicant Has Failed to Show Falsity of Torres's Testimony

With respect to the first prong of our false-evidence inquiry, applicant contends that, based on the evidence that Pena was shot twice, as shown by the amended autopsy report and the habeas testimony of Dr. Wolf, he has conclusively proven the falsity of all of Torres's eyewitness testimony. We, however, conclude that the new evidence that Pena was shot twice fails to adequately demonstrate that Torres's testimony was false, as applicant suggests. Although we would ordinarily defer to the habeas court's findings that Torres's testimony was false based on the newly available forensic evidence, we decline to defer to those findings under these circumstances, in which doing so would improperly circumvent the jury's role in assessing the credibility of witness testimony and resolving the inconsistencies in the evidence presented at trial.

Applicant suggests that Dr. Wolf's opinion that Pena was shot twice, as opposed to once, now demonstrates that the second shot to the back of Pena's head "definitely occurred" at the location where his body was found because the second shot must have occurred within a minute of the first shot to his face and while his heart was still pumping. Given Torres's conflicting testimony indicating that applicant shot Pena at Porras Bakery and transported him to the nature center, applicant suggests that this discrepancy with respect to the location of the shooting proves that all of Torres's testimony is fabricated. Contrary to applicant's suggestion and the habeas court's determination in this regard, we agree with the State's

position that, under the circumstances of this case, the inconsistencies between Torres's testimony and the expert opinion testimony of both Dr. Shrode and Dr. Wolf do not rise to the level of demonstrating that Torres's testimony was false.

The new habeas evidence indicating that Pena was shot twice causing two wounds to his head is only moderately different from the trial evidence indicating that he was shot once with a single bullet that caused two wounds to his head. Applicant's theory explaining the significance of the fact that the wound to the back of Pena's head was caused by a second bullet, as opposed to being an exit wound, is only marginally supportive of applicant's defensive theory at trial that the volume of blood at the nature center suggested it was the likely location for the shooting. Furthermore, Dr. Wolf's testimony addressing the probable location of the shooting was largely redundant of Dr. Shrode's testimony on that same subject and, therefore, Dr. Wolf's new habeas testimony regarding the blood evidence at the scene does not establish that Torres's testimony was false. In particular, in describing the volume of blood that had pooled on the ground under Pena's head, Dr. Wolf acknowledged that it is "hard to judge volume of blood once it's on the ground," but because the scene photographs revealed a "substantial volume" of blood, he opined that, had Pena been shot elsewhere and transported, there would "probably be less" blood on the ground than what appeared in the photographs. When asked directly whether Pena's heart would have to still be pumping at the time he was shot in order for such a large pool of blood to have formed under his head, Dr. Wolf answered, "[A]gain, it's hard to estimate the volume of blood once

it's pooled out onto the ground like that, but it does look like a significant amount of blood. So, yes, I think it's most consistent with his heart still pumping once he was shot." When asked how long a person's heart would continue beating after sustaining such a shot to the face, Dr. Wolf explained that it was "variable, but [the heart] would continue for at least a minute." The essence of Dr. Wolf's testimony was that, in spite of the limitations associated with this sort of blood-evidence analysis, the pooling of blood under Pena's head and the relative lack of blood on his clothing and the back of his head were persuasive indicators that he had been shot at the nature center and then remained alive for some time at the scene.

In questioning Dr. Wolf at the habeas hearing, the State sought to demonstrate that, aside from the disagreements reflected in the amended autopsy report, Dr. Wolf largely agreed with Dr. Shrode's trial testimony. In particular, the State sought to establish that the primary basis for both experts' opinions as to the probable location of the shooting was the blood evidence that was known at the time of trial, rather than the newly discovered evidence of the second gunshot wound. Taking note of the similarities between the two experts' testimony in this regard, the State questioned Dr. Wolf as follows:

> State: [J]ust generally at this point, can you tell the Court what was Dr. Shrode's testimony as to where the defendant was shot?
> Dr. Wolf: His opinion was the same as mine. He was shot right where he was found.
> State: Okay, so there was no difference for the most part as to what Dr. Shrode testified to at trial and as to what you're saying as to what the forensic evidence is more consistent with [regarding the location of the shooting]?
> Dr. Wolf: In that regard, yes.

The State later asked, "So, there's nothing new, nothing flashy about, I guess, now three

expert opinions as to where this person was [shot]?" to which Dr. Wolf replied, "That's correct."[8] The State then confirmed that Dr. Wolf's disagreement with Dr. Shrode's trial testimony was limited to his opinion as to the number of gunshot wounds and the fact that the shot to the face was an intermediate-range shot as opposed to a contact wound.[9]

Although we agree with the habeas court's determination that Dr. Wolf's opinion as to the existence of the second gunshot wound constitutes credible, newly discovered evidence, we conclude that the number of gunshot wounds is largely inconsequential to Dr. Wolf's opinion that the pooling of blood at the scene indicates that the nature center was the probable location of the shooting. The record, therefore, does not support the habeas court's determination that Torres's testimony has been proven false on the basis of the newly discovered evidence of the second gunshot wound. Moreover, Dr. Wolf's opinion regarding the probable location of the shooting is redundant of Dr. Shrode's testimony that was already passed on by the jury, in light of the fact that the primary basis for both experts' opinions as to that matter was the quantity of blood found at the scene, as opposed to the number of

---

[8] In referring to three expert opinions, the State's prosecutor was apparently referring to the testimony of doctors Wolf and Shrode and the affidavit submitted by forensic analyst Tom Bevel.

[9] In particular, this portion of the habeas record indicates that the State asked Dr. Wolf to "tell the Court what are . . . your disputes with Dr. Shrode's findings in his autopsy report or [ ] his testimony at trial," in an attempt to "line up" Dr. Wolf's "differences of opinions or disputes" with Dr. Shrode's testimony. Dr. Wolf responded by noting the difference of opinions as to the existence of the second gunshot wound and the description of the shot to Pena's face as a "contact shot" as opposed to an intermediate-range shot. The State then asked whether there was anything else that Dr. Wolf had "an issue with" with respect to Dr. Shrode's testimony, to which Dr. Wolf replied, "You know, I think that's about it."

gunshot wounds. This new evidence of a second gunshot wound, therefore, is insignificant with respect to whether Torres testified falsely.

We take note of several additional pieces of evidence that were addressed by both Dr. Wolf and Dr. Shrode as constituting evidence that Pena was likely shot at the nature center: the positioning of Pena's body at the time he was found, including the fact that Pena's hand was still in his pocket and his shirt was tucked in; the absence of grass, dirt, or drag marks on his clothing; and the presence of sand on his knee consistent with him having been on his knees at some point. In his habeas testimony, Dr. Wolf agreed with Dr. Shrode's assessment that these factors constituted additional circumstances pointing to the nature center as the likely location of Pena's murder, and yet these were all circumstances that were presented to the jury in support of applicant's defensive theory and were reconciled against him at trial.[10] We decline to now conclude that these same conflicts serve as an adequate basis to hold that Torres's testimony was false.

Based on Dr. Wolf's testimony and the amended autopsy report, the State stipulated that the credible forensic evidence was "more consistent with the theory that Pena was shot

---

[10] Although applicant does not directly argue that Torres's trial testimony is false based on Dr. Wolf's habeas testimony regarding the distance at which the shot or shots were fired, we note that Dr. Wolf's description of the facial wound as being an intermediate-range gunshot wound, as opposed to Dr. Shrode's opinion that it was a "hard contact wound," is more consistent with Torres's suggestion that applicant was standing around five feet away from Pena at the time of the shooting. That aspect of the amended autopsy report and Dr. Wolf's testimony, therefore, is more consistent with Torres's version of events and does nothing to further undermine his credibility, let alone demonstrate the falsity of his testimony. We also note that Torres never testified directly as to the number of shots he heard, and applicant does not point to that specific aspect of Torres's testimony as being in conflict with the amended autopsy report.

at the location where he was found," as opposed to some other location, and that he died as a result of two gunshot wounds, as opposed to one. But that is not the same, as applicant suggests, as stipulating to the falsity of Torres's testimony. Although we agree with the habeas court's determination that the new forensic evidence is more consistent with Pena having been shot at the location where he was found, the consistency of the forensic evidence with applicant's theory at trial does not, without more, render Torres's testimony false under these circumstances, in which the conflicting evidence with respect to the location of the shooting was largely before the jury that already reconciled any inconsistencies against applicant. We further note that the State, both in its arguments to the habeas court and to this Court, made clear that it was not stipulating to the falsity of Torres's testimony. Rather, it emphasized that, even if Dr. Wolf's testimony and the amended autopsy report were credible, the credibility of that new evidence was inadequate to give rise to a finding that all of Torres's testimony was false because the jury had already resolved the conflicts in the evidence against applicant and in favor of Torres's testimony. Specifically, even after entering into the stipulation, the State argued to the habeas court that applicant's false-evidence claim should fail because Dr. Shrode had

> already testified during the trial and gave six different examples as to why he believed the evidence was consistent with the murder scene being only at the nature center. . . . So the jury had this conflict before them. . . . And, again, it's within their province . . . to believe all, some, or none of that testimony. . . . The jury believed Torres enough to the point where they felt it was beyond a reasonable doubt that [applicant] intentionally and knowingly caused the death of [Pena].

Similarly, in its briefing to this Court, the State asserted that, notwithstanding the stipulation based on Dr. Wolf's testimony, it is "clear that the jury was aware that there was [a] conflict in the testimony . . . regarding the location of Pena's death. To have a finding that is contrary would be to invade the province of the jury to resolve conflicts in testimony[.]" Given these assertions by the State, we decline to hold that Torres's testimony is false on the basis of the stipulation.

Having concluded that the new evidence serves only to bolster the primary assertions that were passed upon by the jury at applicant's trial, we hold that, under these particular circumstances, a habeas court owes deference to the jury's determination with respect to the weight and credibility of the evidence that was presented at trial. Here, the record merely highlights the existence of inconsistencies in the evidence presented at applicant's trial with respect to the location of the shooting, but those inconsistencies do not, without more, support the trial court's fact finding that Torres's testimony is false. *See*, *e.g.*, *United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997) (fact that witnesses have given inconsistent or conflicting testimony does not establish that such testimony was false); *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) (conflicting trial testimony between witnesses "merely establishes a credibility question for the jury" and does not suffice to demonstrate that the evidence was false). Because the habeas court failed to take into account the jury's reconciliation of the conflicting evidence in the record, thus substituting its own judgment for that of the jury that reviewed substantially the same pertinent evidence, we decline to

defer to the habeas court's fact findings that false evidence was introduced at applicant's trial. We hold that the new habeas evidence, viewed in light of the totality of the record, fails to demonstrate by a preponderance of the evidence that Torres's testimony gave the jury a false impression. *See Ghahremani*, 332 S.W.3d at 477.

### C. Applicant Has Failed to Show Materiality of Torres's False Testimony

Alternatively, with respect to the second prong of our false-evidence inquiry, even were we to conclude on the basis of the forensic testimony presented at trial and on habeas that Torres testified falsely as to the location of the shooting, we could not conclude that such false testimony would have been material to the jury's verdict. We observe that the jury could have convicted applicant of Pena's murder even if it credited Dr. Shrode's testimony indicating that the shooting occurred at the nature center while at the same time believing that portion of Torres's testimony identifying applicant as the person who caused Pena's death. As the record clearly indicates, the jury was aware of the inconsistencies between Torres's version of events and the expert opinion testimony, and it nevertheless chose to convict applicant on the basis of Torres's testimony. Even were we to agree with applicant that the portion of Torres's testimony describing the location of the shooting has been proven false, we could not conclude that any such false evidence tipped the scales in favor of persuading the jury to believe Torres's testimony or to convict applicant. Thus, even were we to accept that this limited aspect of Torres's testimony has been proven false, we could not now conclude that it would have been materially false.

## IV. Conclusion

Although his false-evidence claim is not subject to procedural default because its factual and legal bases were not reasonably available in an earlier proceeding, applicant has failed to demonstrate that the introduction of false evidence at his trial violated his due-process rights. We, accordingly, deny relief.

Delivered: June 17, 2015

Publish