

# NUMBER 13-18-00029-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

CODY ALLEN PEMBERTON,                                                   Appellant,

v.

THE STATE OF TEXAS,                                                        Appellee.

On appeal from the 24th District Court
of Jackson County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Hinojosa and Tijerina
Memorandum Opinion by Chief Justice Contreras**

Appellant Cody Allen Pemberton appeals his first-degree felony convictions for intentionally or knowingly causing serious bodily injury to a child and intentionally or knowingly causing serious mental deficiency, impairment, or injury to a child. *See* TEX. PENAL CODE ANN. § 22.04(a)(1)–(2). By four issues, Pemberton argues that the trial court

erred because it (1) charged the jury on punishment without any reference to community supervision, (2) included an erroneous statement in the jury charge concerning the application of good conduct time and parole, and (3) told the jury that it could consider whether Pemberton testified as a circumstance against him. Pemberton also argues that (4) his due process rights were violated by "the inadvertent use of false evidence." We affirm.

## I. BACKGROUND

Pemberton is the father of B.P., a minor child.[1] When B.P. was thirty-five days old, Pemberton's wife, B.P.'s mother, left the infant under Pemberton's care. Thereafter, Pemberton called his wife and told her that he had dropped B.P. B.P. suffered a contusion to her liver, bleeding in her brain, bruises to her back and chest, and fractures to her parietal skull, left femur, left radius, and seven ribs. Pemberton was indicted on four counts: count one alleged Pemberton intentionally and knowingly caused serious bodily injury to B.P., a person fourteen years or younger, with an unknown object; count two alleged Pemberton intentionally and knowingly caused serious mental deficiency, impairment, or injury to B.P., a person fourteen years or younger, by causing her head to collide with an unknown object; and counts three and four alleged the same offenses but that Pemberton acted recklessly. Pemberton pleaded not guilty and proceeded to trial.

Prior to trial, Pemberton filed a sworn application for community supervision. At trial, evidence was introduced that on March 26, 2014, Pemberton called his wife and asked her to come home because he dropped B.P. Pemberton and his wife then took the baby to the emergency room at a hospital in Jackson County. Thomas Roznovsky, a

---

[1] We use initials to protect the identity of the child. *See Salazar v. State*, 562 S.W.3d 61, 63 n.1 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.).

certified nursing assistant, testified that Pemberton told him that he stumbled and was afraid he was going to fall on the baby so he threw B.P. towards the crib.[2]  Stephanie Cruz, a registered nurse, testified that Pemberton initially told her he was standing next to the crib but, as their interview progressed, Pemberton explained he was actually walking to the crib and started to fall when he threw the baby towards the crib.  Corporal Jeff Tipton of the Edna Police Department testified that he interviewed Pemberton at the Jackson County hospital, and a recording of Pemberton's statement to Tipton was admitted into evidence.  Pemberton told Tipton that he went to pick up B.P. from the crib and tripped over one of his dogs as he was stepping back, at which point he "chucked" B.P. towards the crib.  Pemberton told Tipton that B.P.'s chest landed on top of one of the railings of the crib and that her legs got caught in the slats as she tumbled.

The following day, B.P. was transferred to Texas Children's Hospital in Houston, Texas.  Bruce McConathy, a Captain with the Edna Police Department, and Clinton Wooldridge, the Chief of the Edna Police Department, interviewed Pemberton at the Houston hospital and made a recording of their interaction, which was admitted into evidence.  In the recording, Pemberton told the officers that he tripped over the larger of the two dogs he owns, fell backwards, and "shot putted" the baby towards the crib before he hit the floor, causing B.P. to hit the railing of the crib with her chest and her legs to get stuck on the slats of the crib.  Tina Bradshaw, a registered nurse from the Texas Children's Hospital, testified Pemberton told her he fell backwards after tripping over a large dog.  Pemberton's wife testified that the couple owned "very small dogs."

---

[2] Roznovzky initially testified Pemberton told him he stumbled forward but later stated that Pemberton told him he had fallen backwards.

3

Marcella Donaruma, M.D., a pediatrician specializing in child abuse, testified about the injuries suffered by B.P. and explained Pemberton told her he fell backwards after picking B.P. up from the crib and tripping over a little Papillon dog. Pemberton told Dr. Donaruma he threw B.P. back towards the crib, and Dr. Donaruma explained in detail why she believed Pemberton's story "was implausible and failed to explain the nature of the child's injuries in any way that was satisfactory." Patricia Mancuso, M.D., a pediatric neurosurgeon, testified that she reviewed MRIs of B.P.'s brain and that they indicated B.P. had sustained significant damage to her brain.[3] Dr. Mancuso explained that the most recent MRI of B.P.'s brain indicated that she had volume loss of brain tissue and that B.P. will suffer from weakness on the right side of her body for the rest of her life. Dr. Mancuso stated that she suspects B.P. has lost some of her peripheral vision and that it would likely mean B.P. will never be able to drive a vehicle, but it could not be exactly determined due to her age. B.P.'s mother testified about the physical and emotional impairments B.P. now suffers as a result of the injury. The jury found Pemberton guilty of count one and count two.

At the punishment phase of trial, the State introduced evidence that Pemberton moved in with a new girlfriend, Emily Schomburg, after being indicted for the offenses concerning B.P. and that he physically abused Schomburg's three-year-old daughter when he was left alone with that child. Schomburg further testified that Pemberton punched her refrigerator so hard that he dented the door and broke his hand. Evidence

---

[3] According to Dr. Mancuso, B.P. had blood collections over the surface of her brain, blood between the two hemispheres of the brain, and blood between the superior compartment and the interior compartment parts of her brain. B.P. also had changes in the brain that showed damage to fiber tracts.

4

was also introduced that Pemberton punched a friend in high school without being provoked and while his friend was facing away from him.

The State requested that the trial court remove the instruction in the punishment charge concerning the possibility of community supervision because Pemberton failed to present any evidence that he was eligible, and the trial court agreed. The jury assessed punishment at life imprisonment for both counts. This appeal followed.

## II. JURY INSTRUCTIONS

### A. Standard of Review

"[I]n each felony case . . . tried in a court of record, the judge shall, before the argument begins, deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case . . . ." TEX. CODE CRIM. PROC. ANN. art. 36.14. Our first duty in analyzing an alleged jury-charge error is to determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If we find error, then we analyze that error for harm. *Id.* The degree of harm necessary for reversal depends on whether the defendant preserved the error by objection. *Id.* If there is error and the defendant preserved the alleged error, we must reverse as long as the error was not harmless. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). If the defendant failed to object, we will reverse only if the record shows egregious harm. *See Ngo*, 175 S.W.3d at 750; *Cueva v. State*, 339 S.W.3d 839, 848 (Tex. App.—Corpus Christi–Edinburg 2011, pet. ref'd). An egregious harm determination must be based on a finding of actual rather than theoretical harm. *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015). Actual harm is established when the erroneous jury instruction affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory.

5

*Id.* "This is a high and difficult standard which must be borne out by the trial record." *Reeves*, 420 S.W.3d at 816.

## B. Jury Instruction on Community Supervision

By his first issue, Pemberton argues the trial court erred because the jury was not instructed at the punishment phase that it could consider community supervision.

In certain circumstances, a jury may recommend to the trial court that a defendant's sentence be suspended and that he be placed on community supervision. *See* TEX. CODE CRIM. PROC. ANN. art. 42A.055. A defendant is eligible for jury-recommended community supervision if: "(1) before trial begins, the defendant files a written sworn motion with the judge that the defendant has not previously been convicted of a felony in this or any other state; *and* (2) the jury enters in the verdict a finding that the information contained in the defendant's motion is true." *Id.* (emphasis added). "The right to [community supervision] is valuable; when testimony reasonably supports a defendant's motion for [community supervision], the issue should be submitted to the jury." *Trevino v. State*, 577 S.W.2d 242, 243 (Tex. Crim. App. [Panel Op.] 1979). However, the burden of proof as to eligibility for community supervision is on the defendant. *Baker v. State*, 519 S.W.2d 437, 437 (Tex. Crim. App. 1975); *Thompson v. State*, 267 S.W.3d 514, 519 (Tex. App.—Austin 2008, pet. ref'd). To be eligible for community supervision, a defendant's sworn application for community supervision *and* the evidence must show that he has never been convicted of a felony. *Thompson*, 267 S.W.3d at 519; *Green v. State*, 658 S.W.2d 303, 308 (Tex. App.—Houston [1st Dist.] 1983, pet. ref'd); *see* TEX. CODE CRIM. PROC. ANN. art. 42A.055. In other words, the mere filing of a sworn application is not sufficient to show eligibility for community supervision.

6

*Palasota v. State*, 460 S.W.2d 137, 140–41 (Tex. Crim. App. 1970); *Thompson*, 267 S.W.3d at 519; *see* TEX. CODE CRIM. PROC. ANN. art. 42A.055.  Accordingly, a trial court does not err by refusing to instruct the jury regarding community supervision in the absence of evidence to support a request for community supervision.  *Thompson*, 267 S.W.3d at 519; *see Walker v. State*, 440 S.W.2d 653, 659 (Tex. Crim. App. 1969); *Tenery v. State*, 680 S.W.2d 629, 640 (Tex. App.—Corpus Christi–Edinburg 1984, pet. ref'd).

Here, Pemberton filed a sworn motion with the trial court stating he was eligible for community supervision; however, Pemberton presented no evidence in support of his motion.  Because Pemberton did not present evidence that he did not have a final felony conviction, the trial court did not err by refusing to give the charge.  *See Palasota*, 460 S.W.2d at 140–41; *Thompson*, 267 S.W.3d at 519; *Green*, 658 S.W.2d at 308–09.

Pemberton further argues that his due process rights were violated because he was the only one who could have testified as to whether he had a felony conviction.  We disagree.  A defendant need not personally take the witness stand and testify that he has never been convicted of a felony offense.  *See Trevino*, 577 S.W.2d at 243.  Rather, he or she may obtain such evidence from others who sufficiently know him.  *Id.*; *see also Ramirez v. State*, No. 08-99-00406-CR, 2000 WL 1595694, at *5 (Tex. App.—El Paso Oct. 26, 2000, no pet.) (mem. op., not designated for publication).  The trial court here never suggested that Pemberton was required to testify and, although the question of whether to testify may have presented Pemberton with a difficult choice, this did not violate his right against self-incrimination.  *See Cantu v. State*, 738 S.W.2d 249, 256 (Tex. Crim. App. 1987) (stating that "[n]o constitutional violation is presented by the fact of a difficult decision for a defendant" and that a defendant "must weigh the benefits of

7

presenting his case against the detrimental possibilities that cross-examination on all relevant issues might present"); *see also Gonzales v. State*, No. 14-03-01227-CR, 2005 WL 363945, at *2 (Tex. App.—Houston [14th Dist.] Feb. 17, 2005, no pet.) (mem. op., not designated for publication) (noting that "[t]he Fifth Amendment protects against compelled self-incrimination" and that "[b]ecause a defendant is not required—much less compelled—to testify in order to be eligible for community supervision, [the statute] is not violative of the Fifth Amendment of the U.S. Constitution"). We overrule Pemberton's first issue.

## C. Jury Instruction on Parole and Good Conduct Time

By his second issue, Pemberton argues that the trial court submitted erroneous instructions to the jury concerning parole and good conduct time.

Pemberton was charged with two first-degree felonies: (1) intentionally or knowingly causing serious bodily injury to a child and (2) intentionally or knowingly causing serious mental deficiency, impairment, or injury to a child. *See* TEX. PENAL CODE ANN. § 22.04(a)(1)–(2). For the offense of causing serious bodily injury to a child, Pemberton would be eligible for parole after serving half of his sentence or thirty years, whichever is less, without consideration of good conduct time. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a); TEX. GOV'T CODE ANN. § 508.145(d)(1). For the count of causing serious mental deficiency, impairment, or injury to a child, Pemberton would be eligible for parole when his time served plus good conduct time equals one-fourth of his sentence or fifteen years, whichever is less. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(b); TEX. GOV'T CODE ANN. § 508.145(f).

8

Here, the charge instructed the jury as to both offenses that, "Under the applicable law in this case, if the defendant is sentenced to a term of imprisonment, he will not be eligible for parole until the actual time plus good conduct time equals one-fourth of the sentence imposed."  The State concedes that this was error.  Pemberton, however, did not object to the charge at trial; therefore, we review the error for egregious harm.  *See Arrington*, 451 S.W.3d at 840.

We determine on a case-by-case basis whether a defendant was egregiously harmed by an erroneous jury instruction.  *Id.*  In doing so, we consider:  the entire jury charge; the state of the evidence, including contested issues and the weight of the probative evidence; the parties' arguments; and all other relevant information in the record.  *Id.*; *Cueva*, 339 S.W.3d at 848.

Although Pemberton received the maximum sentence, a number of other factors mitigate against a finding of egregious harm.  First, the parole instruction contained the standard language admonishing the jury not to consider the extent to which parole law might be applied to Pemberton,[4] and a curative instruction, in combination with other factors, may cure any error.  TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a); *Murrieta v. State*, 578 S.W.3d 552, 556 (Tex. App.—Texarkana 2019, no pet.); *see Igo v. State*, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006).  Further, we presume the jury followed the trial court's instructions absent evidence to the contrary.  *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009); *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App.

---

[4] Specifically, the charge stated:

You may consider the existence of the parole law and good conduct time.  However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant.  You are not to consider the manner in which the parole law may be applied to this particular defendant.

9

2005); *Murrieta*, 578 S.W.3d at 556; *Cueva*, 339 S.W.3d at 853. Pemberton does not point to any evidence that rebuts the presumption that the jury followed the trial court's instructions to disregard the extent to which parole law might be applied to him, and we find none. *See Igo*, 210 S.W.3d at 647; *Murrieta*, 578 S.W.3d at 556; *Cueva*, 339 S.W.3d at 853.

Second, the evidence showed that Pemberton caused serious bodily injuries to his infant daughter when she was left alone under his care and that the brain injury she suffered will impair her for the rest of her life. There were recordings admitted into evidence where Pemberton states his version of events, and he admitted in the recordings and to multiple witnesses that his actions led to B.P.'s injuries. Dr. Donaruma explained in great detail how and why she believed Pemberton's story did not explain the injuries suffered by B.P. For example, Dr. Donaruma explained that the way B.P.'s ribs were fractured vertically, and the fact that she had ribs fractured on both sides of her body, was inconsistent with Pemberton's version of events detailing that B.P. fell on her chest a single time. Dr. Donaruma also explained that B.P. had isolated bruises to her torso that were inconsistent with a single impact against the rail of a crib. In sum, Dr. Donaruma stated:

> So the fact that she has left and right bilateral injuries and front and back that—biplanar injuries as well as multiple organ systems, central nervous system, skeleton, abdomen, skin, all injured in the course of this event makes it unbelievable as an explanation for the—for the accumulation of this child's injuries.

Dr. Mancuso described the life-long cognitive and functional impairments to B.P. caused by the injury to her brain.

There was also evidence of a second instance of physical abuse towards a three-year-old toddler that occurred after Pemberton had been indicted for the offenses against

10

his infant daughter. The circumstances surrounding that alleged second incident and Pemberton's behavior in reporting the child's injuries to Schomburg were similar to what happened with B.P. After Pemberton called Schomburg and told her that her three-year-old daughter had fallen, Schomburg returned home to find her daughter with bruises throughout her body, a gash to her eye, and bruising and redness to the right side of her face and neck. The CPS investigator who investigated the incident concerning Schomburg's daughter testified that the child told her, as the child was being removed from the home, "does this mean that Cody is not going to hit me anymore?" The mothers of both children also testified that their daughters now suffered from similar behavioral problems, and there was other evidence admitted of Pemberton's violent behavior, including that he punched a high school friend unexpectedly and that he broke his wrist punching a refrigerator when he was asked by Schomburg about the pending criminal charges concerning B.P. Therefore, the evidence relating to punishment was strong.

Finally, neither party mentioned parole or good conduct time during voir dire. However, we do note that the State, during its closing argument in the punishment phase, argued: "Now remember, he will get out. He will get out. Life in prison. Talks about parole. There's eligibility for parole. He will eventually get out, but you need to keep him in as long as possible and that's why I'm asking you to assess the two life sentences." Nevertheless, the State did not mention the application of good conduct time or the length of time Pemberton had to serve before becoming eligible for parole, and the jury instructions correctly instructed the jury not to consider these matters when assessing punishment.

The above evidence, as well as the nature of the offense, offer sufficient support to explain the jury's assessment of punishment without suggesting egregious harm from the charge error. *See Cueva*, 339 S.W.3d at 853–54; *Stewart*, 293 S.W.3d at 858. The jury could have viewed the abuse of B.P. here as particularly heinous because the victim was Pemberton's own child who was barely over a month old, especially in light of the allegation that Pemberton abused a second child a short time thereafter under similar circumstances. We overrule Pemberton's second issue.

## D. Verbal Error When Instructing the Jury

By his third issue, Pemberton argues that the trial court erred because it told the jury it could consider whether Pemberton testified as a circumstance against him. Here, the trial judge stated the following as he read the charge to the jury:

> Our law provides that a Defendant may testify in his own behalf if he elects to do so. This, however, is a privilege accorded a defendant and in the event he elects not to testify that fact may be taken as a circumstance against him. In this case the Defendant has elected not to testify and you are instructed that you cannot and must not refer or allude to the fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against him.

An objection must be raised to preserve a complaint regarding an improper judicial comment, *see* TEX. R. APP. P. 33.1; *Unkart v. State*, 400 S.W.3d 94, 99 (Tex. Crim. App. 2013), and Pemberton did not object to at the trial court when the presiding judge made this statement or request a curative instruction. Accordingly, we conclude that this complaint has been waived. *See* TEX. R. APP. P. 33.1; *Unkart*, 400 S.W.3d at 99. Furthermore, the trial court immediately after stated the correct instruction to the jury, and the jury charge itself included the correct language. We overrule Pemberton's third issue.

12

### III.    MATERIALLY FALSE EVIDENCE

By his fourth issue, Pemberton argues that his due process rights were violated "by the inadvertent use of false evidence because of subsequent improvements in the science of biomechanics."[5]    Pemberton further states that no "timely objection was necessary to the inadvertent use of false testimony by the State since it was impossible to know that the objection was proper at the time the evidence was admitted."

### A.  Applicable Law

The use of materially false evidence to procure a conviction violates a defendant's due-process rights under the Fifth and Fourteenth Amendments to the United States Constitution, regardless of whether the falsity of the evidence is known to the State at the time of trial.  *Ex parte de la Cruz*, 466 S.W.3d 855, 866 (Tex. Crim. App. 2015).  A defendant claiming such a violation must prove his or her claim by a preponderance of the evidence.  *See id.*

> Pemberton argues that he:
>
> suffered a due process violation by the inadvertent use of false evidence because of subsequent improvements in the science of biomechanics. Further, no witness for the State was qualified as an expert in the field of biomechanics.  Neither the defense nor the State were aware of advances in the science of biomechanics at the time of trial.  These advances, if known, would have changed the expert testimony in favor of [Pemberton].

We disagree.  First, Pemberton presented no evidence indicating that there have been subsequent improvements in the science of biomechanics after his trial in January of 2018 or that the doctors' testimony here was false or has been discredited; rather, Pemberton cites concurring opinions from a 2012 case from the Texas Court of Criminal Appeals

---

[5] Biomechanics is the study of the application or relation of the laws of mechanics to the body. *Nabors Well Servs. Ltd. v. Romero*, 508 S.W.3d 512, 530 (Tex. App.—El Paso 2016, pet. denied).

discussing the role of biomechanics in the death of an infant child. *See Ex parte Henderson*, 384 S.W.3d 833, 837–43 (Tex. Crim. App. 2012) (per curiam) (Cochran, J., concurring).[6]  There is no evidence that the doctors here relied on the same scientific principles for their conclusions as the medical examiner in *Henderson*.  *See id.*  We therefore reject Pemberton's contention that the doctors' testimony in this case was materially false.  *See Ex parte de la Cruz*, 466 S.W.3d at 866.  Second, the improvements in biomechanics discussed in *Henderson* were discovered at least by 2007, well before Pemberton's trial in 2018.  *See Ex parte Henderson*, 384 S.W.3d at 839.  Thus, Pemberton's argument that the advances were unknown at the time of his trial fails.  Third, to the extent that Pemberton argues that the doctors in this case were not qualified to give expert testimony on the field of biomechanics, we note that Pemberton did not object to either doctors' testimony on this ground.  Accordingly, this complaint has been waived. *See* Tex. R. App. P. 33.1.  Finally, the offenses Pemberton was convicted of do not require expert testimony on biomechanics, *see* Tex. Penal Code Ann. § 22.04(a)(1)–(2), and Pemberton does not challenge the sufficiency of the evidence underlying his convictions. We overrule Pemberton's fourth issue.

---

[6] Henderson was charged and convicted of capital murder for the death of a three-and-a-half-month-old child due to a head injury.  *See Ex parte Henderson*, 384 S.W.3d 833, 837 (Tex. Crim. App. 2012) (per curiam) (Cochran, J., concurring).  The medical examiner who performed the autopsy testified unequivocally at trial in 1995 that the child "came to his death as a result of a severe closed head injury . . . characteristic of abuse, homicide."  *Id.*  However, in 2007, the medical examiner provided an affidavit at Henderson's habeas corpus hearing stating that, "Based on the physical evidence in the case, I cannot determine with a reasonable degree of medical certainty whether [the victim's] injuries resulted from an intentional act or an accidental fall."  *Id.*  The medical examiner testified that, as a result, "he would change the manner of death from 'homicide' to 'undetermined.'"  The contested issue in *Henderson* was whether the child could have suffered the injuries that led to death from an accidental short fall or whether Henderson intentionally caused the injury that led to the child's death.

14

## IV.   Conclusion

We affirm the trial court's judgment.

DORI CONTRERAS
Chief Justice

Do not publish.
Tex. R. App. P. 47.2(b).

Delivered and filed the
31st day of October, 2019.