

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR–85,833–01

## EX PARTE EDWARD GEORGE MCGREGOR, Applicant

## ON APPLICATION FOR A WRIT OF HABEAS CORPUS
## FROM FORT BEND COUNTY

**KEEL, J., delivered the opinion of the Court in which KELLER, P.J., and KEASLER, HERVEY, RICHARDSON, and SLAUGHTER, JJ., joined. WALKER, J., concurred. YEARY and NEWELL, JJ., did not participate.**

## O P I N I O N

Applicant was convicted of capital murder and sentenced to life in prison. He seeks relief from his conviction by way of an application for writ of habeas corpus raising five issues. The convicting court recommended that relief be granted on the first two issues. These alleged that the State failed to disclose benefits it promised to three witnesses, the three witnesses falsely denied the promised benefits, and one of the

witnesses gave false substantive testimony. We filed and set the case to consider those two issues. We decline to follow the convicting court's recommendation in favor of relief on issues one and two because disclosure was made, falsity was not proven, or the undisclosed or false evidence was not material. Issues three and four lack merit, and issue five is moot. Consequently, we deny relief.

## Habeas Review

In habeas review, we generally defer to the convicting court's findings that are supported by the record, and findings about whether a witness testified falsely are reviewed under a deferential standard. *Ex parte Weinstein*, 421 S.W.3d 656, 664 (Tex. Crim. App. 2014). But this Court is the ultimate fact finder in habeas proceedings. *Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012). If the record shows that the convicting court's findings and conclusions are not supported by the record, we "will proceed cautiously with a view toward exercising our own judgment." *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008). Moreover, we will decline to follow the trial court's findings when doing so would "improperly circumvent the jury's role in assessing the credibility of witness testimony and resolving the inconsistencies in the evidence presented at trial." *Ex parte De La Cruz*, 466 S.W.3d 855, 867 (Tex. Crim. App. 2015).

Materiality is a legal question that we review *de novo*. *Id*. at 866 (false evidence claim); *United States v. Bagley*, 473 U.S. 667, 683 (1985) (reviewing court should assess

materiality in a *Brady* claim in light of the totality of the circumstances); *Ex parte*

*Brandley*, 781 S.W.2d 886, 917 n.3 (Tex. Crim. App. 1989) (Campbell, J., dissenting)

(materiality in a *Brady* claim is an issue for us to decide *de novo*).

## *Brady* Claims

Due process is violated when the State suppresses material evidence that is

favorable to the defense. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Favorable

evidence includes impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676

(1985); *Ex parte Chaney*, 563 S.W.3d 239, 266 (2018). Inducements to testify must be

disclosed. *Giglio v. United States*, 405 U.S. 150, 155 (1972). Determining the existence

of an inducement depends on whether the evidence "tends to confirm rather than refute

the existence of some understanding for leniency." *Duggan v. State*, 778 S.W.2d 465,

468 (Tex. Crim. App. 1989), quoting *Giglio*, 405 U.S. at 153 n. 4. The understanding

need not be explicit. *Duggan*, 778 S.W.2d at 468.

Suppressed favorable evidence is material "if there is a reasonable probability that,

had the evidence been disclosed to the defense, the result of the proceeding would have

been different." *Bagley*, 473 U.S. at 682. "A 'reasonable probability' is a probability

sufficient to undermine confidence in the outcome." *Id*. To determine materiality, we

balance exculpatory evidence against the evidence supporting the conviction. *Ex parte*

*Miles*, 359 S.W.3d 647, 666 (Tex. Crim. App. 2012). The favorable evidence "must be

evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112

(1976). If the exculpatory "evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." *Id*.

The materiality of favorable evidence does not depend on proof that its disclosure would have yielded an acquittal. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). It is not a test of evidentiary sufficiency. *Id*. Nor is it a question of "whether the State would have had a case to go to the jury if it had disclosed the favorable evidence." *Id*. at 453. Instead, the question is whether, considering the suppressed evidence "collectively, not item by item," *id*. at 436, "we can be confident that the jury's verdict would have been the same." *Id*. at 453. Under this standard, a claimant can prevail even if "the undisclosed information may not have affected the jury's verdict." *Wearry v. Cain*, ___ U.S. ___, 136 S.Ct. 1002, 1006 n. 6 (2016) (*per curiam*). "And it is important to consider how disclosure could have affected defense preparation, with an awareness of the difficulty of post-trial reconstruction." *Pena v. State*, 353 S.W.3d 797, 812 (Tex. Crim. App. 2011).

Withheld impeachment evidence may not be material if the State's other evidence is strong enough to sustain confidence in the verdict. *Smith v. Cain*, 565 U.S. 73, 76 (2012). Withheld impeachment evidence also may not be material if it is cumulative of evidence on the same topic and heard by the jury. *Turner v. United States*, ___ U.S. ___, 137 S.Ct. 1885, 1895 (2017). But withheld impeachment evidence is not immaterial just because a witness was impeached with other evidence on other matters. *Id*.; *Wearry*, 136 S.Ct. at 1006-07.

## False Evidence Claims

Due process is violated by the State's use of material false evidence to secure a conviction. *Giglio*, 405 U.S. at 155 (Giglio entitled to a new trial for accomplice's false denial of the government's promise not to prosecute him in exchange for his testimony); *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959) (Napue entitled to a new trial because of accomplice's false testimony that he had not been promised a reduced sentence in exchange for his testimony). For a habeas applicant to prevail on a false evidence claim, the evidence must be both false and material. *Weinstein*, 421 S.W.3d at 665.

To evaluate falseness, we examine whether the testimony taken as a whole gave the jury a false impression. *Weinstein*, 421 S.W.3d at 666. "[D]efinitive or highly persuasive evidence introduced in a post-conviction habeas proceeding may show by a preponderance of the evidence that testimony used to obtain a conviction was false." *De La Cruz*, 466 S.W.3d at 867. But "circumstances that were presented to the jury in support of applicant's defensive theory and were reconciled against him at trial" will not serve as an adequate basis to hold that the witness's testimony was false. *Id*. at 869-70.

When a habeas applicant shows that the State knowingly used false evidence and that claim could not have been raised on direct appeal, the evidence is material unless we are convinced beyond a reasonable doubt that the false evidence did not contribute to the verdict. *Ghahremani*, 332 S.W.3d at 478. However, if the State unknowingly presented false evidence at trial, a habeas applicant must show by a preponderance of the evidence

that the false evidence contributed to his conviction or sentence. *Ex parte Chabot*, 300 S.W.3d 768, 771 (Tex. Crim. App. 2009). We evaluate the materiality of evidence cumulatively rather than considering each piece of evidence in isolation. *Wearry*, 136 S.Ct. at 1007 (citing *Kyles*, 514 U.S. at 441).

Because Applicant's *Brady* claims are co-extensive with his false testimony claims, we will analyze materiality using the false testimony standard, which is more favorable to Applicant. *Ghahremani*, 332 S.W.3d at 477.

## Background

In this fact-intensive case we will include only a short summary of the facts relevant to the habeas claims. For a more detailed description of the facts see *McGregor v.State*, 394 S.W.3d 90 (Tex. App.— Houston [1st Dist.] 2012).

## The Issues

Applicant was prosecuted in 2010 for the 1990 capital murder of Kimberly Wildman. The prosecution was a joint effort of the district attorney's offices of Fort Bend and Harris Counties. Applicant's *Brady* and false evidence allegations center on three witnesses presented for the State by Harris County assistant district attorney Elizabeth Shipley. Two of the witnesses, Marvin Paxton ("Paxton") and Adam Osani ("Osani"), testified to incriminating statements that Applicant made to them while they were housed together in the Harris County jail in 2007-08. The third witness, Delores Lee, also known as Delores Gable ("Delores"), testified that she was Applicant's

neighbor in 1990 and overheard him admit on the night of Wildman's murder that he was her killer.

The convicting court concluded that all three witnesses falsely denied that benefits were promised to them. It also concluded that Delores testified falsely about her biography and the things she observed on the night of Wildman's killing. The convicting court did not explicitly find that Delores testified falsely about having overheard Applicant's admission that he killed Wildman, but such a finding is implied by its findings that she lied about her biography and her observations on the night of the murder.

**State's Case-in-Chief**

Wildman's Death

Wildman lived in a house at 1419 Whispering Pine, across the cul-de-sac from the McGregor family, who lived at 1411 Whispering Pine.[1] At 11:45 pm on April 17, 1990, she called 911 from her home and reported that a black man had attacked her. Responding to the call, Missouri City police officer Loyd Weathers found the front door open and Wildman on the kitchen floor; she was nude, writhing in pain, and saying, "Help me, I'm dying." She had many stab wounds on her arms and a bone-deep defensive cutting wound to her left hand. Wildman told Weathers that her attacker was a black man whom she did not know. Life Flight took her from the scene.

---

[1]In the record the street name is sometimes pluralized, i.e., "Whispering Pines," but this opinion will use the singular form.

In Wildman's upstairs bedroom police found evidence of a violent struggle. There was no evidence of theft, and no useful prints were recovered from the house, but an apparent point of entry was noted at a side window. Documents found in her house suggested that Wildman either was or wanted to become a topless dancer. Police pursued leads on several possible suspects, but none were fruitful.

Wildman's autopsy revealed that she died of two stab wounds to the back. Her vaginal and anal swabs yielded spermatozoa which, 16 years later, were found consistent with Applicant's DNA profile.

Delores

Delores testified that in 1990 she lived at 1719 Tower Grove Court at the corner of Whispering Pine with her husband Brian Gable ("Brian") and her children. Wildman lived across the street and four doors down. Delores was acquainted with Wildman and the McGregor family, and Applicant was close to Brian.

On the night of Wildman's death, Delores arrived home with Brian and her children at about 8 p.m. and saw neighbors outside and the police at Wildman's house. There were sirens, flashing lights and a helicopter. While Delores and Brian were outside, Applicant came over and told Brian that he had "got into it with the lady," and they had had a scuffle; though he had not meant to do so, he killed her. Applicant had a fresh cut on his lip that night. Delores identified him in court and remembered him from

the scar over his lip.[2]

In 2006 Delores was prompted by a news report about Applicant to write to Fort Bend County District Attorney Michael Elliott offering information about the Wildman case. Elliott did not respond to her letter, but FBI Agent Glenn Gregory eventually did.

Delores testified that neither Shipley nor Gregory ever promised her anything in exchange for her testimony. Because she was incarcerated, she did not want to testify against Applicant and was concerned about her safety, but she wanted "to do the right thing." On cross examination she denied having asked the prosecution for any help with parole.

**Extraneous Offense: Murder of Edwina Barnum**

Barnum's Death

On May 25, 1994, Houston police were called to the apartment of Edwina Barnum, who worked as a dancer at Foxy's strip club and as a prostitute. They found the door to her apartment kicked in and her fully clothed body on the bedroom floor. A bloody knife wrapped in a place mat lay beside her. Her hands were bound behind her back with a bootlace; a belt was twisted tightly around her neck; and a pillow covered her head. The pillow bore a bullet hole burned by muzzle flash, and a bullet casing was inside the pillow. No gun was found in the apartment. The bed sheets were partly off the bed, twisted around and under Barnum's leg, and a used condom, lighter, and ashtray were

---

[2] Brian died before Applicant became a suspect.

later discovered among the sheets. The condom was positive for semen, and Applicant's and Barnum's DNA profiles were later found on the condom, but there was no evidence of a sexual assault.

Barnum suffered three fatal assaults: the ligature around her neck, the stab wound to her back and the gunshot wound to her head.

Chane Spencer

Spencer and Barnum became friends when they worked together as dancers at Foxy's. They often car pooled to and from work, but on the day of her death, Barnum was nowhere to be found when it was time to go home. At 3 a.m., Barnum called Spencer and asked for a ride from a gas station; she sounded hysterical, frantic, and frightened. Spencer found her crying, disheveled, and intoxicated, and took her home and stayed with her for about half an hour. Spencer called later to check on her, but Barnum hung up abruptly. Spencer learned of Barnum's death later that night.

Spencer testified that in 1994 Applicant frequented Foxy's, always wearing his UPS uniform and usually with fellow UPS workers.

Monique Johnson

Monique Johnson testified that Applicant and Barnum ran in the same social circle and saw each other at parties at Kevin Wilson's home from 1990 to 1994. Applicant would flirt with Barnum, but she was not interested in him.

Roy Swainson

Roy Swainson, a Houston Police Department homicide detective, testified that in his post-arrest interview, Applicant denied knowing Barnum and did not recognize her when shown her picture.

Osani

In 2007-08, Osani was in the Harris County jail for felony family violence when he met Paxton and Applicant. Applicant would make sexually suggestive and threatening remarks to Osani, and on one such occasion Paxton told Applicant to leave Osani alone. Applicant responded by reaching through the bars to try to get at Paxton and saying, "Bitch, I'll kill you like I did those other two bitches, mother fucker."

Applicant warmed up to Osani, however, after he overheard him talking about having visited the Harris County Medical Examiner's Office where his friend worked. Applicant asked Osani if his friend would be able to collect DNA evidence and if he had "jurisdiction" in Fort Bend County.

Paxton

While charged with five cases of aggravated robbery, Paxton was housed in the Harris County jail in 2007-08 with Applicant and Osani. Applicant would bully Osani, and Paxton once intervened. Applicant told Paxton to shut his fucking mouth "before I kill you like I did those two bitches." When Applicant later apologized to him, Paxton asked if he had been "for real," and Applicant said, "Oh, yeah, I did it." He explained that he had lost his cool and killed those two females whom he had "fucked."

**Defense Case**

McGregor Family

Applicant's mother, aunt, and brother testified that the McGregor family, absent the father, moved to 1411 Whispering Pine in 1989. They exchanged pleasantries with Wildman, who stood out in the neighborhood because of the skimpy clothes she wore. Applicant's brother, Tesfa, testified that Applicant was home all evening on the night of the Wildman murder. At around 11 p.m., Applicant yelled that there was someone in the backyard and the family went outside. Applicant's mother, Sonia, said she and her three[3] children stood in their driveway. Applicant stayed on the driveway with the rest of the family and did not go to a house at the corner of Tower Grove, and no one talked to them while they were out there. Applicant had no scrapes, cuts, or blood on him that night, and they never knew Brian or Delores. Sonia and Applicant's aunt, Margaret Reid, said Applicant got the scar on his lip in 1992.

Applicant

Applicant testified that one day Wildman invited him into her house where they flirted and kissed. The second time he went to her house, they had sex. On the night she was killed, Applicant went to her house at about 6:30 p.m., and they had sex again. Afterward she told him that he had to go because someone was coming by. He left before sundown, and she was uninjured at that point.

---

[3] Applicant had a sister who was killed in 2004.

Applicant later saw police in the backyard, and he, his mother, and brother all went outside. He stayed in the driveway with his family. He did not go to another house. The circle was filled with emergency vehicles, and other traffic could not enter. He never saw Delores Lee Gable until she testified, and his father was not home that night.

Applicant would go to parties at Kevin Wilson's house in 1990. He met Barnum there and knew her as "Nina." In spring 1994 he had a girlfriend who worked at Foxy's, and he took her to and from work every day. One time after a fight with his girlfriend, Applicant gave Barnum a ride home, and they had sex. In 1995 he started working for UPS, and he was a Foxy's customer from 1996-98.

Applicant was arrested for Wildman's murder on May 1, 2006. In his interview with HPD homicide detective Jim Binford he denied knowing Kimberly Wildman because he did not recognize the name, and he was scared. When Binford tried to show him pictures of Wildman, Applicant refused to look at them. Eventually he realized that Binford was talking about his neighbor, but he continued to deny knowing her because "they had already pulled guns on me and arrested me, so I didn't want to talk about it with them or discuss it with them."

On December 1, 2006, Applicant was arrested for Barnum's murder. He denied knowing Barnum because they had already arrested him, and he was scared.

Jacques Washington

A few days after Wildman's murder, Applicant told his friend Jacques Washington

that he had had an "affair" with Wildman.

**State's Rebuttal**

Jim Binford

After his arrest Applicant denied knowing Wildman and claimed no relationship with her. Binford did not tell him that his DNA was found in her body.

Laura Christian

Christian met Delores in 2010 when they were inmates in the Fort Bend County Jail. Christian was in custody because of a drug court sanction, and Delores was there on a bench warrant from prison to testify against Applicant at his jury trial.

Christian encountered Applicant one day on the prisoner van. He asked Christian if she knew Delores "Gayle" and described Delores. Applicant told Christian that he had been a friend of Delores's late husband and that Delores was a liar and a snitch, an opinion he wanted Christian to share with everyone in Delores's tank. Applicant also wanted Christian to tell Delores that if she continued lying and being a snitch, she was going to have something coming.

Christian told McGregor that Delores had mentioned that she was supposed to be able to parole out because of her testimony; "she believed that for her testimony she was going to get off of parole." Delores told Christian "that she believed that she would get off parole based upon her cooperation in" Applicant's case.

**Allegation One: Witness Deals**

Did the State promise benefits to Osani, Paxton, and Delores in exchange for their testimony; did the State fail to disclose any such promises; and did the witnesses falsely testify that there were no such promises?  The convicting court answered each of these questions in the affirmative but did not specify the nature of the promises or make specific credibility findings.[4]  Given these limitations, our first task is to determine whether and what undisclosed benefits were promised to the three witnesses.

Osani

Osani told Applicant's jury that he was in jail in 2007-08 facing a felony domestic violence charge.  After he testified against Applicant in the grand jury, Osani's case was reduced to a misdemeanor, and he was sentenced to a year in jail.  He was released from jail within weeks of his grand jury testimony after serving six months of his one-year sentence.

Osani denied that he had a deal for his testimony.  He testified that Roy Swainson, an investigator for the State, came to him "out of the blue" to interview him about the incriminating remarks Applicant had made to him in jail; Shipley never promised him anything in exchange for his testimony in front of Applicant's jury; and he did not know of anything she had done for him in relation to his case.  He initially denied knowing that

---

[4]The purported credibility finding about Shipley, for example, pertained to the sincerity and validity of her belief about her duty to disclose witness deals rather than her credibility.  As for Paxton, his lawyers, and Delores, the court implicitly included them among a group of witnesses it deemed credible in unspecified "portions of their testimony" and not credible in other unspecified "portions of their testimony."

his attorney, Terrence Gaiser, had told Shipley that Osani had information about Applicant, but after he was impeached on this point with his grand jury testimony, he admitted that he knew Gaiser had been talking to Shipley. He maintained, however, that he had not known what they talked about and that Gaiser never told him that he was going to get a reduced sentence. He denied knowing that snitches get deals from the DA or a "wink and a trust me" but agreed that although his case was pending when he testified before the grand jury, he got to go home shortly thereafter.

Gaiser testified at habeas that Osani asked him to get a deal in exchange for his information about Applicant, and Gaiser told Osani that he would receive consideration on his case if he testified against Applicant. Specifically, Gaiser told Osani that his cooperation would be taken into account by the State when it made a sentencing recommendation. According to Shipley and the prosecutor handling Osani's case, Shipley told her about Osani's cooperation against Applicant, and it was a factor in the resolution of his case. Applicant's lawyer, Don Bankston, testified that he was not informed of Shipley's promise to Osani.

The habeas record supports a finding that Shipley promised Osani that she would report his cooperation to his prosecutor; Shipley failed to disclose that promise to Bankston; and Osani testified falsely that he received no benefit for testifying against Applicant. We address materiality later in this opinion.

Paxton

The jury heard the following from Paxton about his legal situation: After testifying against Applicant in the grand jury, Paxton pled guilty to two of five pending aggravated robbery charges; the remaining three charges were dismissed. After that, his cases were repeatedly reset for sentencing, and he was set for sentencing the week following his appearance at Applicant's trial. He testified that he was facing a range of five to 99 years on the cases to which he had pled guilty with a cap of 45 years pursuant to a plea agreement. Paxton testified that, although he had no guarantees, he knew his lawyer would be in contact with his prosecutor after Applicant's trial.

In response to leading questions on cross examination, Paxton answered in the affirmative that Shipley had told him that if he provided good information on Applicant's case, it was possible she would bring his cooperation to the attention of his prosecutor and the judge presiding over his case and that she "could" report his cooperation to them.

Shipley and Bankston testified at habeas that Shipley disclosed to the defense her promise to bring Paxton's cooperation to the attention of his prosecutor. But Bankston also testified to his suspicion that Shipley would "come back and recommend a finite number that was far less than 45 years" and do so "after the fact" to avoid having to disclose it. In fact, Paxton secured a plea agreement for seven years on his two aggravated robbery charges the week after his testimony at Applicant's trial.

Applicant maintained at habeas that the seven-year deal was made before Paxton testified at Applicant's trial. He proved that after the trial Shipley recommended the

seven-year sentence to Paxton's prosecutor; Paxton's plea papers were changed from a cap of 45 years to an agreement for seven years; and Shipley filed a motion to keep Paxton separate from Applicant in the Harris County jail. Shipley, Paxton, and Paxton's plea lawyer testified that the seven-year deal was reached after Paxton testified, the documentary evidence of Paxton's plea agreement supports their testimony, and there was no evidence to the contrary. It is unlikely that Shipley would have committed to a specific deal for a given sentence before Paxton testified because there would have been no reciprocal commitment from Paxton. This record does not support a finding that Shipley promised Paxton seven years before he testified at Applicant's trial.

Alternatively, Applicant argued that Paxton testified falsely by downplaying as a mere possibility Shipley's promise to report his cooperation against Applicant to Paxton's prosecutor. Paxton told Applicant's jury that Shipley told him she "could" tell his prosecutor about his cooperation against Applicant. Shipley testified at habeas that she told Paxton she "would" make such a report, a promise that she disclosed to Bankston. Paxton's potential bias was fully revealed by his testimony, and the fact that his cases were still pending and that he had no deal more specific than a 45-year cap suggested a greater incentive to curry favor with the State than otherwise. *See Bagley*, 473 U.S. at 683 ("The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction."). We

cannot conclude that Paxton's testimony that his cooperation "could" rather than "would" be reported to his prosecutor gave the jury a false impression.

Delores

Delores denied having been promised anything for her testimony and claimed that she wanted "to do the right thing." On cross examination she initially denied knowing that the prosecutor could make a recommendation to the parole board but then said "I've heard prosecutors help but I've never asked for any help," and she admitted to knowing that a time cut is where the prosecutor makes a recommendation to the parole board to cut a sentence.

At the habeas hearing Shipley and investigator Robert Vernier testified that Shipley told Delores before trial that she "could" write a letter to the parole board; Vernier conceded that Shipley might have said that she "would" write such a letter. In a letter to her parole attorney, Lori Redmond, Delores said that Shipley talked to her about parole during her interview before Applicant's trial. Redmond testified via affidavit that Delores informed her two days before she testified against Applicant that Shipley was going to write a letter to the parole board for her cooperation against Applicant. After testifying and while Applicant's trial was still underway, Delores wrote to Shipley asking for a letter to the parole board. Shipley did write a letter immediately following Applicant's trial, and in later correspondence with Delores, told her that she had "kept [her] word" to her. In a 2014 email exchange with a supervisor, Shipley said that she was

writing yet another letter to the parole board as part of an agreement with Delores.

Shipley did not tell Bankston that she had offered a parole letter to Delores for her testimony, and she did not correct the record when Delores told Applicant's jury that she had been promised nothing for her testimony. The record thus supports a finding that Shipley failed to disclose her promise to Delores of a parole letter, and failed to correct Delores's false testimony that she had no such promise. We address materiality later in this opinion.

### Allegation Two:  False Substantive Testimony

Applicant's theory at habeas was that Delores lied about everything at trial. He submitted that Delores was fed information about him and Wildman by Alicia Parker, his ex-fiancé, while Delores and Parker were housed in the same prison unit in 2006, the same year Delores wrote to Elliott.[5] He proposed an explicit finding that Delores lied about having overheard his admission to Brian, but the convicting court did not adopt it. Instead the court found that Delores testified falsely about her name, her address, having been married to Brian, having seen a cut on Applicant's lip on the night of Wildman's murder, and having seen Applicant's father, a.k.a., "Big Ed," that night. The only significance of these findings is their implication that Delores also testified falsely about

---

[5] In 2009, Alicia Parker spoke to Agent Gregory regarding Applicant. Her only allusion to the Wildman murder was that on one occasion when she and Applicant were in an argument, Applicant's sister said, "You don't want to mess with my brother. You'll end up like the lady down, down the street." Alicia told Agent Gregory she did not know what Applicant's sister meant.

having overheard Applicant's admission to Brian that he killed Wildman. If the findings are not supported by the record, then their implication fails. The convicting court also found that Delores testified falsely about having cancer. The significance of that finding lies in its tendency to hide Delores's ulterior motive in testifying against Applicant.

The trial court's explicit findings about Delores's false substantive testimony suffer one of two flaws; either the defense elicited the testimony, and it was corrected by the State (presence of Big Ed), or falsity was not proven (address, name, marriage, cut on lip, cancer claim). We address each finding below.

**Corrected by State: Presence of Applicant's Father on Night of Murder**

On cross examination of Delores, the defense asked whether she had seen Big Ed in the crowd on the night of Wildman's murder. Delores answered in the affirmative, but that was false because he was in custody. On redirect the State called into question Delores's certainty about having seen Big Ed, and Delores backed off: "Well, I thought he was living there in that house. I wasn't sure. You know, my knowledge of them is basically like Brian, things he tell me."

A prosecutor has a constitutional duty to correct known false evidence. *Duggan*, 778 S.W.2d at 468. Delores's false testimony about Big Ed's presence on the night of Wildman's murder was corrected by the State and will not support Applicant's claim for relief.

**Not Proven False: Address**

Applicant failed to prove by a preponderance of the evidence that Delores's trial testimony about her address in 1990 gave the jury a false impression. Delores's trial testimony about her address was inconsistent, subject to impeachment, and contradicted by other evidence at trial. The evidence offered at habeas was inconclusive and merely highlighted the inconsistencies in the evidence presented the jury heard.

Delores offered conflicting testimony to Applicant's jury about her 1990 address. She named the street variously as Town Glen, Tower Grove, and Tower Gate. She eventually settled on her address as 1719 Tower Grove Court, pointed to it on a map, and identified a picture of it. She called her subdivision "Hunters Trail" instead of "Hunters Glen"; she did not know many of her supposed neighbors; and she could not name any of the streets she would have traveled in order to get home on the night of the murder.

Delores was impeached with prior inconsistent statements about her 1990 address, having told Elliott, Gregory, Bankston, and Bankston's investigator that she lived on Whispering Pine, not Tower Grove. She specified to the FBI that her address was "4111" Whispering Pine, but she told Bankston and his investigator "something to the effect of" 1411, the McGregor family address. Furthermore, her arrest and bail bond paperwork from 1989 and 1990 listed addresses in Houston, not Missouri City.

In its case-in-chief the defense presented Sandra Woods's testimony that her sister, Barbara Gene Taylor, owned and lived in the house at 1719 Tower Grove Court in Missouri City from 1989 to 2003 and corroborated this testimony with the 1989 closing

papers. According to Woods, the only other person who lived with Taylor in that house was her ex-husband. Woods visited her sister "all the time" in 1990 and never heard of Delores Lee, Delores Gable, or Brian Gable. Woods did not know the McGregors, either, and she testified that Taylor kept herself apart from her neighbors.

Applicant's brother testified that he never saw Delores Lee, Delores Gable, or Brian Gable when the McGregors lived on Whispering Pine, and Applicant's mother testified that she had never seen Delores before Applicant's 2010 trial.

This evidence left the State to argue that Delores had simply been mistaken about her address. That was a weak argument because Delores had committed to the address and identified her house by pointing it out in a picture. The house she identified had the unusual feature of no windows in front, making it unlikely that she was simply mistaken.

At habeas the only evidence offered to disprove Delores's claimed residency in Missouri City was the testimony of her mother, Doris Lee, who said that in 1990 Delores lived with her in Houston. Lee also testified that Delores did not always stay with her even when she lived with her.

The conflicting trial evidence created a credibility question for the jury. Since habeas is not an opportunity to re-hash issues fully and fairly litigated before a jury, a habeas court must defer to the jury's judgment about the weight and credibility of evidence presented at trial. *De La Cruz*, 466 S.W.3d at 870. Applicant failed to prove that Delores's testimony about her address was false, and the convicting court's finding

on this point circumvents the jury's role as factfinder.

**Not Proven False:  Name and Marriage to Brian**

The significance of Delores's testimony on these points is rooted in their tendency to prove that Delores had an intimate relationship with Brian.  Marital status does not matter in itself; the issue is whether they had a relationship.  If Delores did not have a relationship with Brian, then she would not have been in a position to overhear Applicant's admission to him.  This logic assumes that Brian, contrary to the defense evidence at trial, did live in the same neighborhood as the McGregors or at least had a relationship with Applicant.  No evidence other than Delores's testimony proved that Brian was a neighbor of the McGregors.  We will assume for the sake of argument that if Delores did not have an intimate relationship with Brian, then she would not have been in a position to hear anything Applicant said on the night of Wildman's murder.

The trial evidence about Delores's last name being Gable consisted of her own testimony and a 1989 bail bond offered by the defense to impeach her testimony about her address; it named her as "Delores Gable."  At habeas Delores's mother Doris testified that Delores's last name was never Gable, and Doris never met Brian Gable.  But Delores's daughter, Dwauna Lee, testified at habeas that Delores had the last name of Gable at some point.  Given the contradictory habeas evidence about Delores's name and the 1989 bail bond showing her last name as Gable, Applicant did not prove that Delores's last

name was not Gable.[6]

Regarding the marriage between Delores and Brian, the only source of evidence at trial on that point was Delores. The habeas evidence was inconsistent. Dwauna testified that she met Brian and assumed that Delores was married to him. But she told the State's habeas investigator that, although Delores and Brian had a relationship, she did not know the nature of it. Doris testified that she never met Brian. Database searches revealed no marriage between Delores and Brian. However, a database search of Brian Keith Gable presented by Applicant did reveal that the address on Delores's 1989 driver license and on a 1989 indictment against her was that of "Brian K Gable," and two of the places Delores claimed at trial that she had lived with Brian – Greenhouse Patio and Brookston Street – are also listed in the report as addresses of "Brian K Gable." Applicant also submitted a transcript of an FBI interview with Brian's brother, Bennie Gable, wherein Bennie told the FBI that Brian had a relationship with a booster named "Delores" and that Brian and "Delores" had an apartment together.

Applicant failed to prove that Delores testified falsely about having been married to Brian. Even if Applicant had proven that Delores falsely testified about having been married to Brian, that would not have disproven a relationship between the two.

**Not Proven False:  Cut on Lip**

Delores was the only witness to testify that Applicant had a cut on his lip on the

---

[6]We also note that Applicant did not seek a finding on this point.

night of Wildman's murder: "It was like, you know, kind of red, like – was fresh at the time, like – like a cut." On cross examination she admitted that she had not mentioned the cut to the FBI and had told Bankston that Applicant had a scar that night – not a cut – and that he had no blood on him. She backed off on the implication that the cut she claimed to have seen in 1990 was the cause of the scar still on his face in 2010, and she said she saw no blood. "It wasn't – it wasn't that large, but there, yes, it is. . . . It wasn't pink like that, though, sir." She said she was not surprised that he got the scar in 1992.

The defense offered at trial the testimony of Applicant, Tesfa, Sonia, and Reid to prove that Applicant had no cuts on him on the night of Wildman's murder.

The habeas evidence – medical records – proved that Applicant suffered a serious cutting wound to his lip in 1992 that required plastic surgery; it did not prove that he did not suffer a superficial cut in 1990. The convicting court's finding that Delores testified falsely on this point is unsupported by the record.

## Not Proven False: Cancer

In its original findings and conclusions, the convicting court found that Delores testified falsely "that she had cancer, which was the reason for testifying." In its supplemental findings, the court found that Delores lied when she testified that she was "dying of cancer[.]" These findings are not supported by the record because Delores did not leave the impression with the jury that she had cancer or was dying of it at the time of her testimony or that cancer was the reason for her testimony. At most, the record would

support a finding that Delores falsely claimed in 2006 – four years before Applicant's trial – that she had colon cancer then and that cancer was the reason for her coming forward then.

The cancer claim originated with Delores's 2006 letter to district attorney Elliott. The letter was admitted without limitation over defense objections, and Shipley read it to the jury. The letter reads as follows with emphasis added and without corrections to grammar, punctuation, or spelling:

> Mr. Elliot,
>
> I'm writing to you concerning the murder case you're handling on Edward McGregor, Jr. When I 1st heard about the case it left my mouth open because I was in awe. I do mean total disbelief.
>
> I know Edward McGregor and his family very well. In fact – at the time of the murder of Kim Wildman – I lived in Missouri City on Whispering Pines as well.
>
> I'm uncertain what all I want to tell you at this point – because I 1st have to consult with a couple of family members. My mother whom is 76 is against me giving over information that could very much seal your case.
>
> Now - let me explain and tell you about myself. I'm Delores Lee - Gable. I was married to a well known drug dealer in Houston, Texas. I'm a mother of 3 and 3 grandchildren. A Blk female, 44 yrs of age. I know Big Ed (Edward McGregor, Sr. And Sonya McGregor) very well. I can assure you.
>
> I'm presently incarcerated and I have been for 12 yrs. 2yrs. at Harris Co. And 10 yrs in TDCJ. I have a 90 yr. sentence for credit card abuse, escape (when they came to arrest me at my mom's house), a drug case for 2 kilo's I received over the telephone in Harris Co. jail, and a solicitation to commit capital murder on my 2 state witness'es – also over the telephone that involved a paid informant. Plus, I have on my record other minute

offenses.  No one was harmed in my solicitation case.

**I've recently been diagnosed with colon cancer.  So – if I can help you convict Edward McGregor Jr and I'm sure I can.  I am seeking some relief from testifying or I'll just leave well enough alone.**

I've spoken with a couple of officers here I'm cool with and they said "if I don't see fit – don't help."  I have a conscious and I really feel mostly sadden for Kim Wildman elderly parents.  I know they need peace.

Yet, I'm still confused if I want to come forth with all I know.  I have to think about my life and if I'm endangering my family or myself and that's what I don't want to do.  I'll do the remainder of my time and know they're safe.

I'll await your response.

/s/ Delores Lee Gable

Asked at trial about her cancer prognosis, Delores answered, "Polyps.  I have polyps, but I've been treated for it" and said that she was still under treatment.  With respect to her letter's reference to "seeking some relief from testifying," Delores said she meant that she wanted "to do the right thing."

Applicant offered at habeas an affidavit from the custodian of health records for inmates of the Texas Department of Criminal Justice Institutional Division which said that there were no records "pertaining to cancer" for Delores from September 1992 to September 2010.  Doris also testified at habeas that Delores had never had cancer.

The record supports a finding that Delores falsely claimed in her 2006 letter that she had colon cancer but does not support a finding that she claimed at Applicant's trial

that she had cancer or was dying of it at that time. She never said she was dying of cancer, not even in 2006. Her testimony that she underwent treatment for polyps would not have left the jury with a false impression that she had cancer in 2010; to the contrary, her live testimony in 2010 downgrading her medical condition to treated polyps tended to undermine, if not disprove, her 2006 claim that she had cancer. Considering the testimony as a whole, Applicant has not shown by a preponderance of the evidence that Delores's statement about being "treated for it" left the jury with the false impression that she had cancer in 2010.

### Materiality

Were the following points material to Applicant's conviction?

> Osani's denial that Shipley promised him anything when in fact she promised that his cooperation as a grand jury witness would be taken into consideration by his prosecutor; and
>
> Delores's denial that Shipley promised her anything when in fact she promised a letter to the parole board.

Because the State knowingly presented the false testimony, the issue is whether we can say beyond a reasonable doubt the false evidence cumulatively did not contribute to the verdict.

Delores's false testimony is not significant to the materiality analysis because her expectation of a parole benefit was proven to the jury by other evidence. *See Turner*, 137 S.Ct. at 1895 (withheld impeachment evidence may not be material if the evidence withheld is cumulative of other evidence on the same topic). First, Delores's expectation

– or at least hope – about parole was suggested in her letter to Elliott; she expressed ambivalence about providing information, she recounted the advice of friendly corrections officers not to help if she did not "see fit" to do so, and she stated that she was "seeking relief from testifying" or she would "just leave well enough alone[,]" a clear hint that she was seeking a *quid pro quo*. Her expectation was also highlighted by her admissions on cross examination that she knew about time cuts and had heard that prosecutors can help with parole. Finally, her expectation was fully revealed by the testimony of her fellow Fort Bend County jail inmate, Christian, who said that Delores expected a parole benefit for her testimony against Applicant. Thus, although Delores falsely denied her expectation of a parole letter, and Shipley failed to disclose her promise, those facts are not significant to the materiality analysis because Delores's expectation was proven by other evidence.

More significant to the materiality analysis is Osani's denial of Shipley's promise to him. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue*, 360 U.S. at 269. Although the jury knew of Osani's favorable plea agreement, it was not informed that his cooperation against Applicant had been a factor in its negotiation. The fact that his case was no longer pending when he appeared at Applicant's trial made it less likely that the jury would have inferred bias on his part; the

jury might have assumed that he no longer had an incentive to please the State. Finally, given that his testimony echoed Paxton's, his apparent status as an unbiased witness would have helped to reinforce their claims about Applicant's incriminating comments to them.

Cases in which false evidence has been held material are often characterized by a lack of physical evidence linking the defendant to the crime and the tendency of the false evidence to undermine the State's other incriminating evidence.

In *Wearry*, for example, the defendant was convicted of murder on the testimony of two witnesses, Scott and Brown, and some circumstantial evidence. *Wearry*, 136 S.Ct. at 1003. The prosecution withheld evidence of (1) Scott's remarks to fellow inmates about his grudge against Wearry, his coaching of one inmate about what to say and suggesting that his saying it would help the inmate get out of jail; (2) Brown's efforts to reduce his sentence in exchange for his testimony; and (3) medical records that made part of Scott's account unlikely. *Id*. at 1004-05. The Supreme Court considered the withheld evidence material because the State's evidence was "a house of cards, built on the jury crediting Scott's account rather than Wearry's alibi[,]" and the only evidence directly tying Wearry to the murder "was Scott's dubious testimony, corroborated by the similarly suspect testimony of Brown." *Id*. at 1006.

In *Napue*, the State's principal witness, Hamer, was an accomplice serving a 199-year sentence at the time of his testimony against Napue. The State failed to disclose its

promise to Hamer of a reduced sentence in exchange for his testimony, and Hamer testified that no promises had been made to him. 360 U.S. at 265. The jury convicted Napue based on evidence consisting largely of Hamer's testimony. *Id*. at 266. The Supreme Court reversed the conviction because of the false evidence. "Hamer's testimony was extremely important because the passage of time and dim light in the cocktail lounge made eyewitness identification very difficult and uncertain, and because some pertinent witnesses had left the state." *Id*.

Similarly, in *Giglio*, the co-conspirator in the offense and only witness linking Giglio with the crime, Taliento, denied that he was promised immunity if he cooperated with the government. 405 U.S. 150, 151-52. In fact, one of the government attorneys involved in the case had promised Taliento he would not be prosecuted if he testified against Giglio. *Id*. at 152. The Supreme Court held that Giglio's due process rights were violated by the false testimony.

> Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.

*Id*. at 154-55.

In *Ex parte Chabot*, new DNA evidence showed that the only eyewitness, a co-conspirator to the offense, testified falsely. This Court concluded that the false testimony was material because it was the only direct evidence, it was critical to the State's case

because the State predicated its theory of the case on the false testimony, and the new evidence also refuted the testimony of another State's witness.  300 S.W.3d at 772.

Applicant's case is distinguishable from the foregoing cases in which materiality was found.  Physical evidence linked Applicant to the victim near the time of her murder, and that evidence was not called into question by the false evidence; Osani and Delores were not Applicant's accomplices or the State's principal witnesses; the State's case was not predicated on the false testimony; and the false evidence did not relate to or refute the witnesses' substantive testimony.

We are convinced beyond a reasonable doubt that the outcome of this case would have been the same even if the jury had heard evidence that Osani's cooperation as a grand jury witness against Applicant would be taken into consideration by his prosecutor and even if Delores had admitted that she expected a parole letter.  Given the DNA evidence against Applicant and the long odds against the defensive theory that he innocently had sex with two women–whom he knew but denied knowing–shortly before their brutal murders four years apart, the State's case was fairly strong.  Viewed in light of the totality of the record, we cannot say that the false testimony was material to Applicant's conviction.

## CONCLUSION

Applicant's Claims 1 and 2 fail because the evidence was either not proven false or was not material to the conviction.  Claims 3 and 4, alleging ineffective assistance and

prosecutorial misconduct, are without merit, and Claim 5 has been made moot by the trial court's *nunc pro tunc* judgment awarding the credit Applicant sought.  Consequently, we deny relief.

Delivered: June 12, 2019

Do Not Publish