

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-89,812-01

### EX PARTE ISMAEL GONZALEZ, JR., Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO.09-09-12748-A IN THE 79TH DISTRICT COURT
### FROM JIM WELLS COUNTY

**KELLER, P.J., filed a dissenting opinion in which YEARY, J., joined.**

The Court grants relief on the basis of false testimony from a police officer and ineffective assistance of counsel. I disagree because the testimony was not false and Applicant has not shown prejudice for his ineffective-assistance claims.

The State's theory of the case is that the victim was killed by Applicant (Ismael Gonzalez) and his co-defendant (Justin Lopez) and that his body was left or buried at a location near their home.[1] Applicant's theory on habeas is that the victim was killed by someone else in room eight at

---

[1] For ease of reference, I will often refer to Applicant as "Gonzalez" and the co-defendant as "Lopez." I sometimes use first names for other individuals when they share a last name with someone else.

the Sunset Motel. The habeas court concluded that a police investigator (Sergeant David Espinoza) gave false and misleading testimony in saying that DNA test results excluded the victim as the source of biological evidence collected from the motel. The habeas court further concluded that the defense attorneys were deficient in failing to obtain the DNA test results and that the victim being killed at the Sunset Motel was a viable defense that the defense attorneys abandoned. First, I disagree with the finding regarding Sergeant Espinoza. A review of the record shows that there was nothing false or misleading about his testimony. Second, the evidence supporting the habeas defense theory is flimsy and refuted by DNA and other evidence, and it does not come close to undermining the evidence supporting the State's case, so I disagree with the conclusion that there is a reasonable probability of a different outcome at trial. Third, given the strength of the State's evidence, I disagree with the conclusion that any other errors of defense counsel gave rise to a reasonable probability of a different outcome. In short, the defense has presented a theory of the murder that a review of the trial record shows to be untenable.

## I. BACKGROUND

The victim, Enrique Hughes, disappeared on November 2, 2008. A police investigation of the disappearance led them to two prostitutes and room eight of the Sunset Motel. But the investigation did not produce enough evidence to make any arrests and the case went cold. In March or April of 2009, a Crime Stoppers tip from Robert Farias caused the investigation to be reopened. Farias led the police to a wooded area where the victim's body had been left or buried. All that remained of the body were bones, but DNA testing and comparison to samples from the victim's family members showed that it was nineteen trillion times more likely that the bones were from a relative like Hughes than from an unrelated individual from the southwestern Hispanic population.

## A. State's Trial Evidence

The State's case at trial was fairly straightforward. Its theory was that Hughes was kidnapped by Lopez, Gonzalez, and Farias and that Lopez and Gonzales killed him at or near the place where his body was ultimately found. Farias testified to this at trial. Lopez and Gonzalez were brothers or half-brothers who lived in a trailer house on property owned by their parents. The parents and other siblings lived in a separate structure on the property. Farias lived with the parents and viewed the mother, Gloria Lopez, as a mother figure. According to Farias, Hughes had called Gloria, asked her why she would not answer the phone, and threatened to call her probation officer and have her arrested. This made Lopez angry, and Lopez said they would "teach him a lesson." Farias explained that the victim was knocked out, tied up, placed into the back of Farias's pickup truck, and taken to the place where he was ultimately killed. Farias testified that he knocked the victim out at one point and drove the truck but that Lopez and Gonzalez were alone with the victim when the victim was killed. However, Farias told the police a number of inconsistent details about what happened and who was involved. At one point, Farias implicated Leroy Trigo as an accomplice but later acknowledged that to be a lie. Farias also admitted that he was a habitual marijuana user and stated that he had multiple-personality disorder with a second (but better) personality named "Frank."

But the State's theory of the case was supported by other evidence. Leroy testified that, around 10:00 or 10:30 p.m. on November 2, 2008, he saw Lopez, Gonzalez, and Farias drive away in a pickup truck with what looked like a fourth person tied up face-down in the back. Leroy saw a fire burning at the property later that night but did not see that as unusual because "they always made fires every day." The next day, Lopez told Leroy that Lopez had hit the victim. Later that day, Leroy overheard Lopez, Gonzalez, and Farias talking about having "taken care of somebody." Leroy

also heard Gonzalez say that the victim had said something about their mother and that they got pretty angry about it, so they took care of him. When asked if Gonzalez told him how they took care of the victim, Leroy responded, "He said that they took him somewhere and stabbed him." When asked what else Gonzalez said, Leroy answered that he said that they, the two brothers, took turns stabbing him. The next day, Leroy received a call from Farias to pick the two brothers up. Using Farias's truck, Leroy picked them up at a location near where the victim's remains were ultimately found. The brothers were sweaty, they smelled like a dead animal, and they were carrying shovels. A couple of days later, Leroy saw Gonzalez and Farias washing out the bedliner of Farias's truck. They had never washed it before.

At some point after the bones were found in 2009, police contacted Leroy's younger brother Jeremy Trigo inquiring about Leroy. Afterwards, Jeremy called Lopez to ask what was going on, and Lopez came over to Jeremy's place to talk to him. Jeremy told Lopez, "Well, they found bones by your house, a block down from your house. You have to know what's going on. Rangers came to my house looking for my brother." Lopez responded that Jeremy's brother "was not involved in any part of that." Lopez initially denied his own involvement, but Jeremy decided to try to manipulate him into telling the truth. Jeremy asked why Lopez did not "dispose of the body a different way to where it would not have led to this." Lopez answered, "It was not like that, but I took care of things." Jeremy asked him, "How come you didn't burn that body. How come you didn't leave him all over town?" Lopez responded, "They're not going to know that it was me that did that. I took care of things." Jeremy responded, "You didn't take care of anything. Obviously, the bones are there. You did not burn anything, the evidence is there. What's going on?" Lopez replied, "Bro, I took care of things, cut him up into pieces and took his head off." This description matched the fact the

victim's bones were found scattered at the grave site and that the skull was never found. Lopez further told Jeremy that, regarding Farias, he was going to "take him out," and regarding Leroy, he was going to "kick his ass."

Physical evidence also linked Lopez and Gonzalez to the crime. A cell phone, burned but recognizable as a Cricket flip phone of the type the victim carried, was found buried behind the brothers' trailer. A belt buckle identified as Hughes's by his widow was found burned in a tub in the brothers' yard.

Phone records showed that Hughes called Gloria repeatedly during the early morning hours of November 2, 2008. The defense elicited that the records showed, on that same date, that Hughes called Roxanne Robledo twice and Robledo called Hughes twice.

Sergeant David Espinoza, of the Alice Police Department, was questioned at trial about room eight of the Sunset Motel. These questions were asked by Lopez's defense attorney. When asked whether blood was found on the walls, Espinoza answered,

> Well, they—they couldn't tell me exactly if it was blood or not. They said it could have been something else other than blood, but they couldn't tell me for sure if it was blood or not because—just because it seems like it in the picture, like there is blood, doesn't mean there's blood from what I was told from the DPS crime lab.

Espinoza testified that people from the crime lab took photos of the room and took samples. Espinoza was subsequently asked by defense counsel, "Did you get any results as to the determination of what this blood matched up with or any kind of forensic evidence about the blood?" He answered, "We—what we did was we got a tooth brush that belonged to Enrique Hughes to see if there was any comparison. And it came back—it came back not from him."

Ray Ramon, a Texas Ranger at the time of the investigation,[2] testified for the State that there were "no links of Mr. Hughes being" in the motel room. During questioning by Gonzalez's defense attorney, Ranger Ramon testified about the crime lab's desire to get a toothbrush or hairbrush that would have the victim's DNA:

> The crime lab wanted us to obtain from Mrs. Hughes a toothbrush or a hair brush or something that Mr. Hughes would use on a daily basis for them to be able to extract DNA from that particular item, at which point we did get a toothbrush from Mrs. Hughes and they were able to get DNA from the toothbrush to compare it to the items that they found at the Sunset Motel."[3]

He further testified that "I have a report where they didn't find anything" and that it was attached to his own investigative report.[4]

## B. Applicant's Habeas Theory of the Case

On habeas, Applicant presents a different theory of the case. His theory is that someone else killed Hughes and it was in room eight of the Sunset Motel. The evidence to support this theory comes from a police report of the investigation at that motel. None of the following information in the police report was presented as evidence at trial.

Eloise Joslin, who the police report suggested was the victim's niece, said that she talked to Robledo about the victim's disappearance. According to Joslin, Robledo said that the victim was supposed to pay her for sex but could not get his Social Security money that was being held by his

---

[2] At the time of his testimony, Ramon was the Chief Deputy of the Jim Wells County Sheriff's Office. Given his status at the time of the investigation, I will refer to him as "Ranger Ramon."

[3] Presumably, the crime lab requested a toothbrush or hair brush because the victim's body had not yet been found.

[4] The trial court admonished Ranger Ramon that his testimony about having the report was not responsive to defense counsel's question, but the trial court did not strike the response from the record or instruct the jury to disregard it.

wife. Then Robledo said she and the victim got into a fight about money and drugs. Robledo said she became so angry that she hit the victim on the head several times with a four-by-four piece of wood and that this caused his head to split open. Robledo told her that Frank Villagran had the body taken and buried it at his ranch.

Vidal Ramirez, who worked for Villagran, told police that he heard Villagran say that Robledo had "whacked some guy over the head and that he died." Juan Hughes told police that he heard that Ramirez had told an individual that Robledo had hit the victim with a two-by-four. He stated that the rumor was that Ramirez heard this story from some girls at a party that Ramirez attended.

Melissa Casas told police that a man named Joe B. beat up the victim after they got into an argument at the motel room. The police interviewed Joe B. Trevino, who admitted being at the motel room but said he left weeks before November 2, 2008. He offered to take a polygraph test and agreed to submit DNA samples. Casas later told police that she had lied about Joe B. assaulting the victim. Casas said that Robledo called Villagran to say that the victim was still in the room and that, shortly afterwards, two men showed up, asked the victim if he knew why they were there (he did not), and proceeded to beat him up. According to Casas, she and Robledo were then told to leave the room.

Susie Gonzalez told police that Robledo told her that she did not kill anyone, that the victim was killed by two guys from the Mexican Mafia, and that his body was dumped in a creek behind the motel.

Robledo admitted to the police that she knew Hughes but said he had never been to the motel room.

## C. DNA Test Results

There were four DNA test reports from 2009, only two of which are in the record. One of the 2009 reports that we have is the report that was admitted at trial–the missing persons report, dated December 22, 2009, which used DNA from the victim's relatives to match the remains found at the burial site that Farias led the police to.

The other 2009 report that we have is an initial DNA report dated February 17, 2009. That report lists the various swabs and material taken from the motel room, a shirt taken from a car, two shirts taken from other locations, and various other materials.[5] Of the swabs and materials taken from the motel room, the report identifies seven items on which blood was detected but does not provide test results for the items or even state that the items were tested. Rather, the report says only that those items are being retained, which suggests that the items had not yet been tested or results had not yet been received.

There are two supplemental DNA reports that are not in the habeas record, one dated August 31, 2009 and the other dated September 29, 2009. We know that these reports exist (or existed at one time) because there is a DNA report from July 18, 2019 in the habeas record that refers to them. We do not know what these two supplemental 2009 DNA reports say.

However, the 2019 report reflects the testing (or retesting) of the seven items from the motel. Assuming the DNA from the toothbrush belonged to the victim, the victim was excluded from the first three items. Trevino's DNA was not excluded from the third item. The remaining four items yielded no DNA profile or no interpretable DNA profile.

---

[5]  For many of the swabs and materials collected, the report detailed that no blood was detected. The report indicated that blood was detected on the shirt taken from the car and the two shirts taken from other locations, but no DNA profile could be obtained on the shirt from the car and one of the other shirts, and the victim was excluded from the DNA profile on the remaining shirt.

## II. ANALYSIS

### A. False Testimony Claim

Due process can be violated by the State's knowing or unknowing use of false testimony.[6]
For due process to be violated, the testimony must be both false and material.[7] Testimony is deemed
to be false if, taken as a whole, it gives the jury a false impression.[8] Because I conclude that the
relevant testimony does not give rise to a false impression, I need not address the standard of
materiality that would apply to this case.

In findings 14 through 19, the habeas court stated:

14. At trial, Sgt. Espinoza testified that results of comparing the blood from the
motel to Hughes's DNA from the toothbrushes established that the blood was not
from Hughes. Espinoza also told the jury that the lab could not tell if some of the
stains were blood or not and the items that were blood was not blood from Hughes.

15. This 2009 Lab Report does not, contrary to what was presented in trial, establish
that the blood stains did not belong to Hughes. The lab report indicates that the
toothbrushes contained mixture DNA, the lab used one of the DNA profiles from a
toothbrush that purportedly belonged to Hughes, and assumed that this DNA was that
of Hughes. The lab then compared the assumed DNA profile against the blood in the
hotel. The 2009 Lab Result also established, contrary to Espinoza's testimony, that
some of the evidence collected was in fact blood, but the lab could not get a DNA
profile from the blood to test it against the assumed Hughes DNA profile.

16. The 2009 Lab Report, which contradict Espinoza's testimony about the results,
was not presented at trial, but was favorable to the defense.

17. The items in the 2009 Lab Report were retested and the 2019 report still
established that the assumed DNA from Hughes excluded him as the source of the
samples. The lab never tested the blood evidence from the motel room against a
known DNA sample from Hughes.

---

[6] *Ex parte Lalonde*, 570 S.W.3d 716, 722 (Tex. Crim. App. 2019).

[7] *Id.*

[8] *Ex parte De La Cruz*, 466 S.W.3d 855, 866 (Tex. Crim. App. 2015).

18. Sgt. Espinoza's testimony at trial was misleading because he testified that the lab excluded Hughes.

19. This lab report does not affirmatively exclude Hughes as the source of blood because the lab did not have his actual DNA profile.

The habeas court's statement in finding 14 that Sergeant Espinoza "told the jury that the lab could not tell if some of the stains were blood" is simply inaccurate. Sergeant Espinoza never told the jury that the lab could not tell if some stains were blood. What he said was that DPS laboratory personnel, who were at the motel room collecting evidence, told him that one cannot tell for sure by looking at a wall that the stain on the wall is blood. That is a true statement, and the initial report ultimately backed it up: for a great number of swabs and stains taken from the motel room, the presence of blood was not detected.

Further, the habeas court's findings are misleading when they suggest Sergeant Espinoza testified that the blood stains did not belong to the victim, and the findings are inaccurate when they suggest that the report was contrary to his testimony because some blood stains did not yield a profile. Sergeant Espinoza was not asked if the lab report established whether all of the various blood stains in the motel room belonged to the victim. He was asked if any results were obtained, and he responded that the results excluded the victim. If the 2019 report is an accurate summation of what the missing 2009 supplemental report on this matter said, then Sergeant Espinoza's testimony was true. The results that were obtained excluded the victim. He was not asked whether the lab was able to obtain results from all the samples.[9]

---

[9] And since we do not have the supplemental 2009 reports in the record, we do not know whether results were obtained from the remaining four samples of blood. It is possible that results were obtained then but could not be obtained in 2019 due to degradation of the sample through the passage of time. The possibility remains, then, that all seven of the blood stains were found not to match the DNA on the victim's toothbrush.

The findings also err to suggest that Sergeant Espinoza's testimony was inaccurate in that the lab only presumed that the toothbrush contained the victim's DNA. Sergeant Espinoza testified that the DNA reference sample for the victim was from the victim's toothbrush. In addition, Ranger Ramon testified that the crime lab asked the police to obtain from Mrs. Hughes a toothbrush or hairbrush used by the victim on a daily basis in order for them to extract DNA. The DNA reference sample for the victim was from the victim's toothbrush. So everyone at trial knew that the DNA used as a reference sample for the victim did not come directly from the victim or from the bones found at the grave site, but instead from his toothbrush, as requested by the crime lab. If the defense attorneys wanted to point out that the toothbrush was, at best, an indirect source of DNA and that the DNA found on it might not actually be the victim's DNA, they could have done so. And while the report says the DNA on the toothbrush was a mixture, even now, no one has produced any evidence that the major component of the DNA from the toothbrush was not in fact the victim's DNA. No such evidence has been produced despite the availability of the DNA profile from the bones as a basis for comparison.

Finding 16 is correct that the lab report was not presented at trial. But the initial 2009 lab report that was before the habeas court does not contradict Sergeant Espinoza's testimony because it has nothing to do with his testimony. The motel room items were not analyzed in that 2009 report; they were retained for future analysis. Without knowing what is in the supplemental 2009 reports, the habeas court cannot know whether either of them contradicts Sergeant Espinoza's testimony. Even assuming that the 2019 report came to the same conclusions as the relevant (but missing) supplemental 2009 report, it does not contradict Sergeant Espinoza's testimony for the reasons outlined earlier. And nothing in the DNA reports that we do have is exculpatory. Nothing in those

reports links the victim to the Sunset Motel. Nor is anything in those reports impeaching since the content of those reports do not in fact contradict Sergeant Espinoza's testimony.

In finding 20, the habeas court misreads the State's closing argument. Here is what the habeas court said:

> The prosecuting attorneys did not and made no effort to correct Sgt. Espinoza's erroneous testimony before the jury. In fact, the District Attorney's Office emphasized Espinoza's testimony during closing argument:
>
>> There's no evidence against it. [Espinoza's] testimony is stone cold. It's rock solid, unless you think he was just sitting up here lying. And if you think he was lying, look me in the eye and tell him that you honestly think he was lying ... Now, we've heard all about this – they told you in their opening statement that they were going to call these – that they were going to call these – they were going to prove these two prostitutes had killed Henry Hughes and his – his blood—they killed him in this hotel, his blood was there, and it was on this car. The Ranger told you that there was no DNA results that were returned positive to Henry Hughes, either in the car or in that hotel. That's dishonest. That's not true as far as a defense principle. Very clearly, no DNA came back to connect those two places or those two items to this murder.[10]

The habeas court inserted Sergeant Espinoza's name in brackets. That insertion is incorrect because the prosecutor was not referring to Sergeant Espinoza—he was referring to Ranger Ramon. The relevant text of the State's closing argument before the ellipsis is as follows:

> When they asked David Espinoza where the reports were, he says, I don't know, the Ranger did that, he's got them. We've got the Ranger here. Remember his testimony when they're talking about that? He says, I've got the report. Did they ask for it? Did they want to see it? Just because he testified to it—now understand, it was uncontradicted that he testified to that issue. There's no evidence against it. His testimony is stone cold. It's rock solid, unless you think he was just sitting up here lying. And if you think he was lying, look me in the eye and tell him that you honestly think he was lying.

---

[10] Brackets and ellipsis in habeas court's findings.

In finding 21, the habeas court says that Ranger Ramon's testimony that "nothing from the Gold Malibu was linked to Hughes" was "misleading" because there "was blood on an item in the trunk." However, the habeas court acknowledges in that finding that no DNA profile was obtained. So Ranger Ramon's testimony that there was no link to the victim was correct.[11]

In finding 23, the habeas court states:

> This Court finds that Espinoza's testimony regarding the results of the lab testing was false and misleading. This Court further finds that the District Attorney's Office failed to correct this testimony. This Court further finds that this erroneous testimony was emphasized by the District Attorney's Office and relied on to convict Applicant.

For the reasons discussed earlier, this finding is not supported by the record. Sergeant Espinoza was asked—by defense counsel—if there were "any results as to the determination of what this blood matched up with or any kind of forensic evidence about the blood" and he answered that a toothbrush sample was used for comparison and the results "came back not from him." Even assuming the 2019 report conveys the same information as was in the missing supplemental 2009 report, Sergeant Espinoza's testimony was both literally truthful (the results that were obtained excluded the victim) and not misleading (nothing linked the motel room to the victim and what evidence there was excluded the victim).

## B. Ineffective Assistance Claim

Under *Strickland v. Washington*, an ineffective assistance claim requires a showing of both deficient attorney performance and prejudice.[12] To show prejudice, the applicant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

---

[11] Finding 22 states that the 2019 report basically came to the same conclusion as the 2009 report.

[12] 466 U.S. 668, 687 (1984).

have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[13] In finding 27, the habeas court says:

> Having these results, counsel could have impeached Espinoza's testimony and defense counsel could have continued presenting their theory that Hughes was killed in the Sunset Motel. Instead, counsel abandoned this viable defense, did not present any witnesses supporting this theory, ceased questioning witnesses about this theory, and both attorneys only briefly mentioned the motel in their closing arguments. Thus, counsel was deficient for failing to obtain the testing results to use at trial and this also prejudiced Applicant because Applicant's defense was not adequately presented to the jury.

Applicant's habeas theory does not present a viable defense because it suffers from serious flaws. To begin with, the habeas theory does not account for Farias's knowledge of the location of the victim's body. Nothing in the police investigation of Robledo, Casas, and the motel room connects Farias to them. To the contrary, people that appear to be completely unrelated to Farias are posited by the Sunset Motel witnesses as the ones who killed the victim and disposed of the body. How, then, did Farias know where the body was located? Despite the various lies and inconsistencies in Farias's accounts to the police, his knowledge of the location of the dead victim's remains ties him to the murder. And while Farias has no known association with the various characters in the Sunset Motel narrative, he was closely connected with Lopez and Gonzalez—he lived on their property.

Then there is the fact that the victim's body was not found where the Sunset Motel witnesses suggested it would be found. His body was not found on Villagran's ranch or on any other property associated with that individual. The victim's body was not found in a creek behind the Sunset Motel or even anywhere near the motel. Instead, the body was found in a place that was near the residence of Lopez and Gonzalez. Also, a cell phone matching the description of the victim's phone was found

---

[13] *Id.* at 694.

buried behind Lopez and Gonzalez's residence. And a belt buckle identified as belonging to the victim was found in a tub on the property. Both items were burned, indicating an attempt to conceal evidence.

Leroy's eyewitness testimony also depicted Lopez, Gonzalez, and Farias together on the date of the murder abducting another individual. Leroy also overhead the three of them saying they had "taken care of somebody." Moreover, Gonzalez made incriminating admissions to Leroy, and Lopez made incriminating admissions to Jeremy. It is true that incriminating admissions were allegedly made by Robledo to others. We do not know whether the witnesses would have testified to those alleged admissions in court. But even assuming they would, those alleged admissions were tied to the body being disposed of by Villagran—which was inconsistent with where the victim's remains were located.

And while there was physical evidence linking Lopez and Gonzalez to the victim's murder, there was no physical evidence linking the victim to room eight of the Sunset Motel. There was physical evidence linking Trevino to that room, but that evidence does not prove anything. Trevino freely admitted to having used that room but claimed it was weeks before the date of the victim's disappearance. At any rate, the accusation that Trevino had something to do with the victim's death was recanted, and there was no physical evidence linking the victim in any way to Trevino.

There is not a reasonable probability that the Sunset Motel evidence and the DNA test result evidence would have caused the result of the trial to be different.

Given the strength of the State's evidence against Lopez and Gonzalez, I would also conclude that any other errors committed by counsel do not, even combined with the failure to present the Sunset Motel theory of the case, give rise to a reasonable probability that the result of the trial would

have changed.

I respectfully dissent.

Filed: September 16, 2020

Publish